# CASES

IN THE

# APPELLATE COURTS OF ILLINOIS

## First District—March Term, 1896.

66  173
189  235
66  173
109  336

## Mexican Central Railway Company v. Herbert B. Gehr.

1. FALSE IMPRISONMENT—*Distinguished from Malicious Prosecution.*—False imprisonment is a trespass committed by an unlawful arrest and imprisonment. If the imprisonment is under legal process, but the action has been begun and carried on maliciously and without probable cause, it is a malicious prosecution.

2. JOINDER OF ACTION—*At Common Law and Under the Statute.*—At common law, a claim to recover damages for false imprisonment, in which the form of action was trespass, could not be joined with a claim to recover for malicious prosecution, in which the form of action was trespass on the case; but under our statute the rule is different and the actions may be joined.

3. JUSTIFICATION—*When to be Shown.*—In actions for false imprisonment and malicious prosecution, where an arrest and imprisonment are shown, it devolves upon the defendant to show a justification.

4. SAME—*What Must be Shown.*—To justify an arrest and imprisonment it must be shown that an offense of a kind punishable by imprisonment had been committed by somebody, and that facts had come to the knowledge of defendant which furnished probable cause or reason to suspect that the plaintiff was the guilty party.

5. TORTS—*Committed in Foreign Jurisdictions.*—To support an action for a tort committed in a foreign jurisdiction, the injury must have been redressible at the time under the laws of the place where it was inflicted, and what would constitute a good defense to the action, if brought there, is a good defense everywhere.

6. SAME—*Right to Obtain Redress Here.*—Where the right to obtain redress for false imprisonment is given by the laws of the country where the injury was committed, the form of remedy afforded by the law of

(173)

this State, where the action is brought, will control in affording the redress guaranteed by both jurisdictions.

7. DAMAGES—$40,000 Not Excessive.—In this case a verdict for $40,000 for malicious prosecution and false imprisonment was sustained.

8. INSTRUCTIONS—As to the Laws of Foreign Countries.—The existence of a law in a foreign country is a question of fact to be determined by the jury from the evidence, but if proved in writing the construction of the writing is to be determined by the court.

## MR. JUSTICE WATERMAN dissents.

1. CRIMINAL PROSECUTIONS—When and Where Complainant not Liable.—Making a complaint before a magistrate, who issues a warrant under which a party is arrested, the warrant not being justifiable in point of law, does not make the complainant a trespasser; but if he points out the party to be arrested, to the officer who has the warrant, he may become one.

2. SAME—Complainant not Liable in Trespass.—If a person makes a complaint to a court of competent jurisdiction, and the court adjudicating upon the law and facts, orders an arrest which is afterward vacated as erroneous, he will not be liable in trespass.

3. SAME—Extent of the Complainant's Liability.—Where a man is given into custody on a mistaken charge, and then brought before a magistrate who remands him, damages can be given against the prosecutor in an action for false imprisonment, only for the trespass in arresting, not for the remand, which is the order of the magistrate.

4. DAMAGES—False Imprisonment and Malicious Prosecution Distinguished.—Where one causelessly procures the arrest of another, he may, if he institutes or secures the institution of judicial proceedings against the arrested party, be liable in an action for malicious prosecution for all that the injured person suffers in consequence of such prosecution; but in an action for false imprisonment, he is liable only for what was done up to the time when, as a result of judicial action, the party is held; from that time, the imprisonment is by judicial authority, and by that alone.

5. PRESUMPTIONS—As to the Laws of Foreign Countries.—While in the absence of evidence as to what the law of a foreign county is, it will, if a civilized State, be presumed that the damages are recoverable for assaults upon the person; but there is no presumption that the same rules prevail there as here as to what constitutes proof of the commission of an offense, or probable cause, and the finding of the court of such country in this regard, it being shown to have had jurisdiction of the subject-matter and person, is conclusive as to what to that court appeared.

Trespass on the Case, for malicious prosecution with counts in trespass for false imprisonment. Appeal from the Circuit Court of

Cook County; the Hon. Charles G. Neely, Judge, presiding. Heard in this court at the March term, 1896. Affirmed. Opinion filed June 29, 1896.

Lyman & Jackson and John J. Herrick, attorneys for appellant, contended that the alleged injury having taken place in the Republic of Mexico, and this action not being maintainable there, it can not be maintained in Illinois.

The laws of Mexico are so dissimilar to our own that our courts will not administer them. C. & N. W. Ry. v. Tuite, 44 Ill. App. 535; Le Forest v. Tolman, 117 Mass. 109; Hanna v. G. T. Ry. Co., 41 Ill. App. 116; Cooley on Torts (2d Ed.) 551; McLeod v. Conn. and Pass. R. R. Co., 58 Vt. 727; Phillips v. Eyre, L. R., 4 Q. B. 225; L. R., 6 Q. B. 1; Knight v. W. J. R. R. Co., 108 Pa. St. 250; Great Western Ry. Co. of Canada v. Miller, 19 Mich. 305; Mexican Natl. R. R. Co. v. Jackson, 33 S. W. Rep. 857; Shedd v. Moran, 10 Ill. App. 618; I. C. R. R. Co. v. Cragin, 71 Ill. 177; Wharton, Conflict of Laws (2d Ed.), Sec. 478.

Assuming the grievances alleged in the declaration occurred in Illinois, it is contended that under the evidence no action could be successfully maintained in this State, for the reason that where one merely states to an officer what he knows of the supposed offense, but without making any charge or requesting any arrest, he does not thereby make himself liable in an action for malicious prosecution. Newell on Malicious Prosecution, 27–30, 211; Gilbert v. Eames, 42 Ill. 143; Burns v. Erben, 1 Robertson (N. Y.) 555; Murray v. Kelso, 10 Wash. 47; Mark v. Merz, 53 Ill. App. 458; Greathouse v. Summerfield, 25 Ill. App. 296; Langford v. Boston & A. R. R. Co., 144 Mass. 431.

The principal is not liable for the torts of the agent unless done within the scope of the agency. Mali v. Lord, 39 N. Y. 381; Central Ry. v. Brewer (Md.), 28 Atl. Rep. 615; Carter v. Howe's S. M. Co., 51 Md. 290, 297; Ill. Cent. Ry. v. Ross, 31 Ill. App. 170; Springfield E. & T. Co. v. Green, 25 Ibid. 106; Chicago C. Ry. Co. v. Mogk, 44 Ibid. 17; Rosenkrans v. Barker, 115 Ill. 331; Titcomb v. James, 57 Ill. App. 296; Callahan v. Hyland, 59 Ibid. 347; Tuller v. Vogt, 13 Ill. 277; Ill. Cent. Ry. v. Downey, 18 Ibid.

259; C., B. & Q. Ry. v. Casey, 9 Ill. App. 632; Oxford v. Peter, 28 Ill. 434; Arasmith v. Temple, 11 Ill. App. 39; Wood v. Williams, 142 Ill. 269; Grund v. Van Vleck, 69 Ibid. 478; Keith v. Lynch, 19 Ill. App. 574; Gilbert v. Emmons, 42 Ill. 143; Bowler v. O'Connell, 162 Mass. 319.

No action for false imprisonment lies where the arrest and imprisonment are made in due course upon regular proceedings of a court having jurisdiction of the subject-matter and the person. Newell on Malicious Prosecution, 67, 68, 481, 482; Lieb v. Shelby Iron Co., 12 S. Rep. (Ala.) 67; Finley v. St. Louis Refrigerator Co., 13 S. W. Rep. (Missouri) 87; Joiner v. Ocean Steamship Co., 12 S. E. Rep. (Ga.) 361.

It is necessary for the plaintiff to prove that the prosecution has terminated in the manner alleged, and the discharge must be shown of record. Comisky v. Breen, 7 Ill. App. 369; Wabash W. Ry. Co. v. Friedman, 146 Ill. 583; Guest v. Reynolds, 68 Ill. 478; Newell on Malicious Prosecution, 454; Phillips on Ev., Vol. 3, 821; Sales v. Briggs, 45 Mass. 421; Stone v. Crocker, 24 Pick. 81, 87; Blalock v. Randall, 76 Ill. 224; Tibbs v. Allen, 29 Ill. 535 at 547; Reynolds v. DeGeer, 13 Ill. App. 113; Walker v. Martin, 43 Ill. 508.

The material allegations of the declaration are not sustained by the evidence and for that reason there can be no recovery. Wabash Western Ry. Co. v. Friedman, 146 Ill. 583; Guest v. Reynolds, 68 Ill. 478.

The verdict is so excessive as to evince passion, prejudice and a misconception of the evidence on the part of the jury. Walker v. Martin, 43 Ill. 508; same case, 52 Ill. 347; Loewenthal v. Streng, 90 Ill. 74; Develing v. Walton, 83 Ill. 390; McConnell v. Hampton, 12 Johns. 234.

Parol evidence is inadmissible to vary or contradict the record of the Criminal Court of Mexico. Looby v. Austin, 19 Ill. App. 325; Roche v. Beldam, 119 Ill. 320; Dillman v. Nadelhoffer, 23 Ill. App. 168; Haywood v. Collins, 60 Ill. 328 at 341; Garfield v. Douglass, 22 Ill. 100; Wiley v. Sutherland, 41 Ill. 25; Harris v. Lester, 80 Ill. 307 at 314.

SETH F. CREWS and TENNEY, McCONNELL & COFFEEN, attorneys for appellee, contended that the injury took place in

the Republic of Mexico, and by the laws of that country an action could be maintained there, hence this action, which is transitory, can be maintained here. The law of Mexico affecting rights of citizens of the United States, transitory in character, will be administered by our courts.

Those actions which, under the common law form of procedure, are termed transitory may, with, perhaps, rare exceptions, be maintained in our courts, though the thing complained of occurred in another State or country. Within this rule, a slander suit for words uttered abroad, a suit for malicious prosecution abroad, or for a foreign trespass or injury to personal property, may be maintained. Bishop, Non-Contract Law (Ed. 1889), p. 55, Sec. 1278. See also Scott v. Lord Seymour, 1 H. & C. Rep. 219 (C. T. of Exch. Eng, 1862); Mostyn v. Fabrigas, Cowper 161; Smith v. Bull, 17 Wend (N. Y.) 323; Canadian Pacific Railway Co. v. Johnson, 61 Fed. Rep. 738; Lister v. Wright, 2 Hill, 320 (N. Y.); Hall v. Coe. 4 Cow. 15; Miss. & Tenn. Railroad Co. v. Ayers, 84 Tenn. 725; Walsh v. N. Y. & New Eng. Railroad Co., 160 Mass. 571.

It is a general rule that for the purpose of redress it is immaterial where the wrong was committed; in other words, a wrong being personal, redress may be sought for it wherever the wrongdoer may be found. Cooley on Torts (Ed. 1880) 470.

By the law of Mexico, which is substantially the same as the common law in force in this country, " Principals shall be held responsible for the acts of their subordinates and servants. It is a necessary condition that the acts or omissions giving rise to the responsibility shall have taken place in the performance of the services assigned to them." Penal Code of Mexico, article 327.

The master is liable for the acts of his servant, not only when directed by him, but also when the scope of his employment or trust is such that he has been left at liberty to do, while pursuing or attempting to discharge it, the injurious act complained of. Cooley on Torts, 534.

It is an unlawful physical restraint by one of another's

liberty, whether in a prison or elsewhere, in a place station-
ary or moving, under claim of authority or not, by bolts and
bars, by threats overpowering the will, or by any other
means. . Bishop on Non-Contract Law, Secs. 206, 208, 214,
217, 228; see also Searls v. Viets, 2 Thomp. & G. (N. Y.) 224;
Cooley on Torts, 195; 2 Addison on Torts, 799; 1 Water-
man on Trespass, Secs. 312, 372.

. MR. JUSTICE SHEPARD DELIVERED THE OPINION OF THE
COURT.

· This was an action on the case, brought by appellee against
appellant.

The declaration consisted of four counts, all for the same
alleged cause of action—an arrest and imprisonment in the
city of Mexico.   The first and second counts allege a ma-
licious prosecution, the third and fourth a false imprison-
ment.   The defendant filed the general issue and two special
pleas.

The special pleas set up that the laws of Mexico provided
for the institution of criminal proceedings by two methods,
to wit, *ex officio*, by the public officers, and by complaint;
and that the proceedings which resulted in the arrest and
imprisonment of the plaintiff were *ex officio*.   The plaintiff
filed a replication to the special pleas, alleging, in effect,
that the particular proceedings were begun by oral com-
plaint by the defendant, etc.

On the issues thus made a trial was had, resulting in a
verdict for the plaintiff for $40,000.   The jury also made
certain special findings.   Judgment was entered on this ver-
dict, and the case is now brought to this court by appeal.

Counsel agree that the distinction between false imprison-
ment and malicious prosecution is correctly stated by
Cooley, in his work on torts, as follows:

" False imprisonment is a trespass committed by an un-
lawful arrest and imprisonment.   If the imprisonment is
under legal process, but the action has been begun and
carried on maliciously and without probable cause, the
wrong is malicious prosecution."

And so, at common law, a claim to recover damages for false imprisonment, in which the form of action was trespass, could not be joined with a claim to recover for malicious prosecution, in which the form of action was trespass on the case.

But owing to our practice act having abolished the distinction between trespass and case, it is admitted that counts upon each cause of action may be joined.   Blalock v. Randall, 76 Ill. 224.

And it follows that if under either count, a case was made, the judgment was proper so far as the pleadings are concerned.

" We are required to hold that every issue of fact that was litigated was found against the unsuccessful party, if necessary to sustain the verdict."   Kellogg Newspaper Co. v. Peterson, 59 Ill. App. 89.

The appellant is a Massachusetts corporation operating a railway in the Republic of Mexico, and having offices in the city of Mexico.   The alleged grievances occurred in the city of Mexico in said republic, where the appellee was temporarily resident in the service of the appellant.   The appellee was at the time, and since, a citizen of Illinois, of admittedly good character and excellent family and social connections.   He went to Mexico in August, 1887, and in December of that year secured a position in the motive power department of the appellant.   He was promoted October, 1888, and in November he received an offer as assistant to the paymaster of the company.   This he accepted.  His salary was raised three times, twice voluntarily by Browne, the assistant treasurer of the company.   On June 1, 1890, seventeen days before the arrest and imprisonment, his salary was raised to $115 per month and expenses.   He possessed the confidence and trust of his employers, and it is evident that very friendly relations existed.   He had frequently been intrusted with large sums of money, and had gone on the road several times to pay off the employes.   On these trips the sum placed in his control were from ten to twenty thousand dollars, and in the city of Mexico, when

he would go to the bank, the sums were as high as $50,000. On the morning of June 17, 1890, a package containing some $8,000 or $9,000 was missed from the safe of appellant's paymaster, and after some investigations, conducted in the first instance by officials of the appellant, and a few hours later by them in connection with the Mexican police, the appellee was placed under arrest, and after being kept in the police station over night, was confined in a jail or prison called Belem until August 14, 1890, when he was discharged without a trial. He afterward remained in the city of Mexico about eight months, after his release from imprisonment, and then returned to Chicago, where this suit was subsequently begun.

Except by reference to what is called an exemplified copy of the original record of the Second Criminal Court of Mexico, that was introduced in evidence on the trial of this cause, we should not know with what offense the appellee was ever particularly charged.

The commencement of that document recites proceedings " in the process of theft " against appellee and others, begun at half past three o'clock in the afternoon of June 17, 1890. It then appears under the recital of proceedings which took place in said court on June 19th, that the judge " in view of the foregoing proceedings and considering that the *corpus delicti* of robbery has been proved, and there being evidence enough to indict" appellee and others, " they are declared formally arrested, charged with the aforesaid crime."

There does not appear to have been thereafter any further judicial inquiry into the facts of appellee's case except that on June 23d he was ordered by the court to " amplify his testimony."

The next proceeding material to the issues here involved, took place, according to the exemplified copy above mentioned, on August 14, 1890, when after " the judge ordered the hearing referred to in article 263 of the Code of Penal Proceedings, the attorney of the State having stated that in his judgment, the facts that were taken in consideration for decreeing the formal arrest of Herbert B. Gehr had disappeared," the appellee was discharged and let go free.

The appellee testified, and it is not denied, that no bail was required of him, and that he was not required to sign any recognizance, bond or obligation for his appearance, upon receiving his discharge, and it was proved by the witness, Mexia, who testified as an expert concerning the law of Mexico, and his testimony in that regard is not denied, that where no bail was required it was absolute liberty that was given to the prisoner.

The rigorous and loathsome imprisonment to which appellee was subjected for upward of eight weeks, is not disputed. After remaining at the police station twenty-two or twenty-four hours, confined, except during the intervals of his examination in the police office, in a room absolutely barren of furniture, with a brick floor, one solid door, and no window, the appellee was taken to the prison Belem. It was proved on the trial, and not contradicted, that the prison and its condition was well known in the city of Mexico.

As his account of his imprisonment is entirely undisputed, and because of its bearing upon the question of damages, we reproduce a part of his description of it.

" When we first entered Belem, we were taken down, as I remember, three long flights of stairs and turned over to a guard in a small court. The guard of the court carried in one hand a large club, and in the other he held a short chain which had a large bull dog to it. He unlocked the door and pushed me in; just gave me a shove as I started to go in—shoved me with his hand. He then locked the door. The door was a solid door, with a small, round opening near the top. I never found out how large a room it was; it was absolutely dark; you couldn't see half a foot in front of you; you couldn't see at all. The floor was stone or brick, and covered with slime. There was nothing in it, that I know of, to sit or lie down on. I stood there; I was afraid to move very far; could not see where I stepped to; so I stood right close to the door. After I was standing there a while, I was feeling around, putting out my hand, and I touched some man; he grunted, asked some question; I

thought it was, 'Who was it?' It was in Spanish. I could not see him; I didn't know who it was; I have no idea what he looked like. I remained in that room from two and a half to three hours. The same guard, with the dog, came, unlocked the door, took me out, took me back, and turned me over to a guard of another department, who took me up these same stairs again, and put me in quite a large, fair room with another man, a Mexican. I remained there until the next morning; that was a very fair room. I had a cot that night. I bought one. The next morning I was taken to another department, and placed in solitary confinement; the size of the room was five feet by seven. It had a solid door, stone wall and brick floor; no furniture at all. It had a small, round window up at the top, about twelve inches in diameter.   *   *   *

"I remained it that room seventy-seven hours. The room was fairly clean. In the morning the door would open and a man would put in a small pot of gruel. At noon the door would open and a chunk of boiled meat and a chunk of bread would be thrown in on the floor, and at four o'clock in the afternoon the door would be opened and a pot of beans put inside the door; that finished the repast for the day.

I was next taken to another department and put in a larger room, 25x45, that was filled with others. It was the same prison—Belem. There was on an average of forty-five people there, and it ran as high as fifty; fifty was the limit. I remained there fifty-five days. It had no furniture at all. The walls were plastered. The floor was brick. On the front side of the room there were two windows, one at each end, opening onto a court. There was a door in the center. Opposite the door there was a stone urinal; in the center of the stone urinal the stone hollowed out, and a water faucet was in the inside of it; the people in that room got their drinking water from there; that was the only drinking water they got. In one corner of the room was an open closet, used by all these people. I suppose the urinal was used by all these peo-

ple; there was no other place. Each one sort of marked out, to sleep in, a little place on the floor; we laid in rows up and down the room; that was all the bed we had—on the brick floor. The room was literally alive all the time with bed-bugs; they were so thick that if you swept your hand across the wall, or on the floor, you would get a great many in your hand, of different vermin; twice a week my room-mate, Mr. Randolph, would bring me bug-powder, which I would make into a paste, and rub that all over my body. Many of the men in the room had been sentenced, and many were not sentenced; there were eight in there for murder, and five for theft and different crimes; this Belem is a penitentiary where convicted persons are put. The food which they gave me was the same as I received when in solitary confinement; it was served in barrels; a man would stand over this barrel with a dipper with a long handle; we would form in line and pass by and he would dip some of this in a can or saucer; I received something besides that from the outside that I would buy; the fare received in the room was gruel in the morning, boiled meat and bread at noon, and Mexican beans at night. A great many of the Mexicans cooked meals in the room; there were usually about a dozen salamanders—earthern stoves—in the room; in these they burned charcoal, and would cook on top of them; they cooked meats, a sort of sausage, not like our sausage; after the salamanders had been burning fifteen minutes or half an hour, the room would become filled with smoke and fumes of this burning meat and grease. The atmosphere from the urinal and open closet was very strong, and one could not stand within four or five feet of them without becoming sick; it would turn your stomach; it affected my physical condition and pulled me down; it affected my stomach. There were two windows on the front side of the room for ventilation; they opened into the court; there was no opening from the opposite direction, or over on the other three walls. The character of this prison was generally known by the people throughout the city of Mexico.

I was given my liberty on the 14th day of August, at ten o'clock in the morning. I was taken down to the door, and told that I could go. My health was very good at the time I was arrested. While in prison my health was broken down. I became sick while there, principally with my stomach. When I was released, I was very much broken down in health, and my stomach was in very bad condition. From eating of this greasy and insufficient food, my stomach got so that I could not retain food on my stomach; as soon as I would eat it, I would be relieved of it; it would come up again, especially with my breakfast. The condition of my stomach has continued more or less from that time up to this. I am still troubled with my stomach all the time. Before the imprisonment, I had no serious stomach trouble; before the imprisonment, the trouble that I had was with my lungs and throat."

It was proved, and is not contended against, that by the laws of Mexico there were two ways of beginning criminal proceedings—one by complaint and the other *ex officio*. At the instance of appellant, the trial court instructed the jury in that behalf, as follows:

" 5. The jury are instructed that by the laws of Mexico there are two ways of beginning proceedings in criminal matters—proceedings *ex officio* and by complaint; the jury are further instructed that in proceedings by complaint a charge or accusation of a crime is made against a certain designated person, and the party making the charge or accusation may become a party to the prosecution and actively assist therein; that the jury is further instructed that in proceedings *ex officio* all the steps in the proceedings, including the arrest, imprisonment and prosecution of the party or parties supposed to be guilty of the crime committed, are taken and carried on by the judicial authorities solely on their own authority and responsibility. If, therefore, the jury believe from the evidence in the case that the plaintiff was arrested and imprisoned by the authorities, acting *ex officio*, and that the defendant made no charge or complaint against the plaintiff, Herbert B. Gehr, accusing

him of robbery or other crime, then the jury is instructed that the defendant is not liable for the damages sustained by the plaintiff by cause of such arrest and imprisonment by said authorities.

7. The jury is instructed that by the laws of Mexico, robbery is a crime which is prosecuted *ex officio;* that in case a robbery is committed, and the person who is robbed gives notice of the robbery to the judicial police of the city of Mexico, without accusing or naming any person as the author thereof, it is the duty of said police to proceed at once to the investigation of the robbery. The jury is further instructed that by the laws of Mexico the said authorities, acting *ex officio,* may lawfully arrest and detain any person during the investigation of the robbery in prison whom they think might be responsible for the crime. If, therefore, the jury believes from the evidence in the case that the defendant notified the chief of police of the commission of the alleged robbery, but did not name or accuse the plaintiff as the author thereof, and took no further part in the proceedings, then the jury is instructed that the defendant is not liable for damages sustained by the plaintiff by reason of his arrest and imprisonment after the giving of such notice to the police authorities.

9. The jury is instructed as a matter of law that when notice of the commission of a crime is given to the legally constituted authorities of the city of Mexico, the said authorities are required by the laws of Mexico to institute and prosecute all the further proceedings necessary for the apprehension and arrest of the supposed guilty parties, and at their discretion to arrest and imprison any person whom they might suppose responsible for the crime; the jury is further instructed that the person who merely gives the said information, contracts no obligation connecting him with the subsequent proceedings, or rendering him in any way liable therefor. If, therefore, the jury believe from the evidence in the case that the defendant merely gave to the legally constituted authorities notice that a robbery had been committed, and did not at any time name or charge

the plaintiff as the author thereof, then the jury is instructed that the defendant is not liable for the damages sustained by the plaintiff after his arrest and imprisonment by the police officers, in the office of the defendant, on the morning of June 17, 1890.

11. The jury are instructed as a matter of law that a person who states to the officers of the judicial police of the city of Mexico, the fact of a robbery or crime having been committed, but without making any charge against any person, or requesting an arrest, does not thereby render himself liable in damages to the person whom such authorities may arrest and imprison on such information. If, therefore, the jury believe from the evidence in the case, that the defendant did not at any time charge the plaintiff, Herbert B. Gehr, with the commission of said robbery, nor request his arrest, then the jury is instructed that the defendant is not liable for the arrest and imprisonment following the arrival of the police officers and the officers of the Mexican Central Railroad Company, on the morning of June 17, 1890, if you believe there was an arrest."

The law of Mexico in that regard seems to have been correctly interpreted and laid down in the quoted instructions. And the main contention of appellant is, that the imprisonment complained of was not the result of any complaint or charge made by it or in its behalf, but resulted, as set up by the special pleas, from proceedings which were purely *ex officio.*

Whatever part the appellant took in the beginning of the proceedings was done through Mr. Jackson, its general manager, or by Mr. Browne, its assistant treasurer, or by both of them acting in concert. The jury made special findings in answer to questions propounded at the instance of the appellant, which are important in determining the part taken by these officers of the appellant. The result of the findings is that the proceedings against the appellee were not prosecuted by the Mexican authorities *ex officio;* that Jackson and Browne made oral complaint to the chief of police of the city of Mexico, charging appellee with rob-

bery, and that in the proceedings against him they constituted themselves assistants to the public authorities of the State. Those findings are altogether in harmony with the general verdict that was rendered, and must stand as expressing the truth, unless clearly opposed to the weight of the evidence.

The general facts testified to, and upon which the findings and verdict must find support, if sustainable, were, that it was arranged beforehand that the appellee and the paymaster should start out on the road on the morning of the day on which the arrest was made, to pay off appellant's employes. Coming into the paymaster's office at about a quarter before eight o'clock in the morning, appellee was told by the paymaster that a package of about $8,000 in currency had been lost from the safe. Conversation about the loss ensued, and in about five minutes, Mr. Browne, the assistant treasurer, arrived. The offices of the paymaster and treasurer adjoined and opened into each other. After being informed of the loss, Browne proceeded to make an examination of the safe and paymaster's office. Finding nothing of the missing money, Browne gave directions that no person should be allowed to leave or enter the office until he returned, and went into his own adjoining office to await the arrival of Mr. Jackson, the general manager, who came in about half an hour. During Browne's absence the doors to the office were kept locked by spring locks which could not be opened from the outside without a key.

During all this time there were in the office besides the paymaster and appellee, the cashier, and four or five other employes, including two or three persons who are called guards.

Jackson, as general manager, was the chief officer and highest in authority in the affairs of the appellant in Mexico. When he came, renewed explanations and inquiries were made, with the result that he and Browne and the paymaster went together to the office of the chief of police, and after an absence of about an hour and a half, returned to

the offices of the company, bringing with them the inspector
general, or chief of police, and the chief detective, and his
assistant, all dressed in citizens' clothing.

Before starting to go to the police office, renewed orders
were given, by Browne certainly, and perhaps by Jackson,
that none of the employes in the office of the treasurer and
paymaster, which adjoined and opened together, should be
allowed to leave, and that no one should be permitted to
enter while they were absent, and such orders were obeyed.
It is reasonably certain that during all of the time from
Browne's first arrival in the morning until after appellee was
taken away by the police, the doors of the offices had been
kept locked by spring locks, but it is in dispute by whose
direction.    It is quite plain, however, that it must have been
by Browne's order.

After the police arrived, a separate examination of the
various employes, including appellee, was had in the pres-
ence of Jackson, and such examination lasted from one to
two hours.

It was testified by the appellee that at the conclusion of
that examination a short conference took place between the
police and Jackson and Browne, in a room by themselves,
at the end of which Browne came to the door of the room
in which appellee was, and, in the presence of Jackson, said
to him, "Herbert, you will have to go with this man," point-
ing to one of the police detectives; a direction or order which
appellee obeyed.

Browne denied having so spoken to appellee, and denied
that he was in private consultation or conference with Jack-
son and the police; and Jackson may be said, perhaps, to
have denied all consultation with the police or with them
and Browne, although his answers to both direct and cross-
interrogatories are so short and in some respects so subject
to criticism, as possibly to have inclined the jury to discredit
him in anything he may have said favorable to the ap-
pellant.

It is reasonably plain that somebody in authority spoke
such words or their equivalent to appellee, for he at once

put on his proper clothing and went away with one of the detectives. It is quite plain that the word that appellee obeyed was not spoken by the police, for neither of them could speak English, and appellee, imperfectly, if at all, understood Spanish. No one but appellee and Browne testified directly on that point, and they being directly opposed to one another upon the question, it was for the jury, before whom they both testified, to say whom they would believe.

Except as it is shown by the exemplified copy of the record already spoken of, that Browne appeared and testified in the Criminal Court on the afternoon of the same day, it does not appear that either Jackson or Browne ever concerned themselves any further either for or against appellee. And if we may look at that record, Browne there testified " under previous legal protest," which, as we understand it, means in substance that he testified without charging anybody in particular with the crime or offense that had been committed.

Another fact that was made to appear in the deposition of Mr. Jackson, taken in behalf of the appellant, upon written interrogatories and cross-interrogatories, may have had much weight with the jury. On cross-examination, after stating that "no charge was made by any employe against the plaintiff," he was asked, and answered, as follows:

Int. "What attorney representing the interest of the Mexican Central Railway Company looked after, or aided in the prosecution of the plaintiff? Ans. No attorney was employed to prosecute this case, but our attorney, Lic Guillermo Obregon looked after the business generally."

Int. " Did a lawyer by the name of Obregon represent you or your company, aid, advise, consult or take any part in the prosecution of the plaintiff while he was under arrest or detained in prison? Ans. See answer to foregoing interrogatory."

Standing without explanation, the jury may well have believed from such evidence that, although the connection of Jackson and Browne with the case ceased when the appellee was taken into custody by the police, still, that thereafter the regular attorney of appellant aided and assisted the prosecution of the appellee in appellant's interest.

The evidence upon which the jury's conclusion was based, that oral complaint was made by Jackson and Browne to the chief of police, charging appellee with robbery, is within very small compass, and, except that Browne denied that he ever made any such charge, is mostly based upon circumstances.

Nothing that is contained in the exemplified copy of the Mexican court proceedings has any bearing upon the question, for it does not purport to show anything that occurred prior to half-past three o'clock in the afternoon, whereas the interview with the police and appellee's arrest took place several hours before.

The chief of police was not called as a witness. Jackson, who was the only other person who could have known what was said or done by himself during the long interview in the morning between himself and the chief of police, testified, but in a way that was not calculated to convey to the jury much sense or reliance upon his testimony.

On direct examination he denied that he had any connection whatever with causing or making the arrest, and that he had anything whatever to do with causing or procuring the imprisonment and detention. On cross-examination, he admitted that he went with Browne and the paymaster to the chief of police, and after about an hour and a half returned with the chief of police to the company's offices, where the investigation and arrest were made.

He also denied participating in the examination of appellee by the police, either as questioner or interpreter, but it seems to have been fairly established by other evidence that he did there act as interpreter between the police and appellee, and counsel for appellant so admit. (Mr. Herrick's brief, p. 50.)

He had the opportunity to tell what he said to the chief of police, but he did not testify to a single word spoken, or act done in the whole interview, which resulted in the police coming with him and making the arrest. That interview was of vital importance upon the question of whether what immediately followed it was caused by a complaint or charge

against appellee, by the appellant, and yet neither party to the interview testified as to a single word of it.

In the absence of all evidence as to what was done at that interview, and with a witness for the appellant upon the stand who could have told all about it, and taking into account what resulted from the interview, and what had gone before, we may not say that the jury were wrong in finding that an oral complaint was then made against the appellee. Cudahy v. Powell, 35 Ill. App. 29.

It was, likewise, the right of the jury to find, if they believed the evidence warranted it, that the imprisonment of appellee began before the police arrived. The special findings that were made are not inconsistent with such a general conclusion.

It was, under the evidence, a question of fact whether or not the office doors were locked, and appellee was forbidden by an officer of the appellant, having the present real or apparent power to enforce the order, to leave the office when Jackson and Browne went for the police.

Jackson was supreme in command of appellant's affairs in Mexico, and Browne, also, was superior in authority to the appellee. Two or more of the persons left in the office with appellee when Jackson and Browne went to see the chief of police, were porters or guards in appellant's service, and it was for the jury to say whether their presence with appellee constituted a sufficient force to make apparently effective upon appellee, the order that no one should be allowed to leave the office during Jackson and Browne's absence. And this is so, even though the spring locks to the door were subject to easy opening by a person on the inside. There is no doubt but that Browne gave the order that no one should be allowed to go out or enter while he and Jackson were absent. He testified explicitly that he gave such order. The order was obeyed, and it can hardly admit of question from all the evidence, that if appellee had attempted to go out he would have been prevented by those who remained with him.

Clearly, appellee would not have been allowed to depart

after the police arrived. It was then a fair inference for the jury to draw, that the imprisonment to which appellee was subjected during the whole eight weeks of his confinement had its beginning with, and was but a continuation of, that which was begun before the police arrived.

If the jury were justified under the evidence, as we think they were, in finding that the arrest and imprisonment of appellee was procured to be made by the appellant, acting through its agents, then it devolved upon the appellant to show a justification for so doing. Cudahy v. Powell, 35 Ill. App. 29.

To so justify, it should have shown that an offense of a kind punishable by imprisonment had been committed by somebody, and that facts had come to the knowledge of appellant which furnished probable cause or reason to suspect that appellee was the guilty party.

The record is barren of legal proof that any crime had been committed by anybody. The paymaster said he missed the money from the safe, and that he could not find it. Whether what he said was true, we find no sufficient proof of, but assuming that the package of money was missing on the morning of June 17th there is nothing but inference upon which a felonious taking of it can be based.

So far as concerns appellee's connection with the felony, if one was committed, or as to the existence of facts upon which he might have been suspected of it, we find nothing in the record beyond the mere circumstance that he was assistant to the paymaster and had access to the safe when it was open, and it is not even argued that he was the guilty person, or that good reason existed for suspecting him.

But it is contended that the action can not be maintained because there was no cause of action under the laws of Mexico, the place where the injury occurred.

It is undoubtedly true, that to support an action for a tort committed in a foreign jurisdiction, the injury must have been redressible under the laws of the place where it happened, and that what would constitute a good defense to the action if brought there, will be a good defense every-

where.    Cooley on Torts (2d Ed.) 551-2; C. & N. W. Ry. Co. v. Tuite, 44 Ill. App. 535.

Personal liberty is a natural right, and whoever takes it from another, except under the forms of law, makes himself liable for the wrong done.

False imprisonment is a wrong wherever committed, and being personal in character, may be redressed wherever the wrongdoer may be found, and as we understand the law of Mexico, as proved on the trial, it there consists in imprisonment without justification, and is a redressible grievance there as here.

The right to obtain redress for false imprisonment being given by the laws of Mexico, where the injury was committed, the forms of remedy afforded by the law of this State, where the action is brought, will control in affording the redress guaranteed by both jurisdictions.   And whether our forms or remedy correspond with theirs or not, is immaterial.

The only remaining question which we feel called upon to discuss, is that of the amount of judgment recovered. When verdicts are so large, it is always a subject of difficulty, there being no possible rule by which to measure compensation in such cases.

The appellee was a young man of excellent family and social connections, of high personal character, and, presumably, of fine sensibilities.   The shock and injury of an imprisonment, such as he endured, can hardly fail to be far greater to him than it would have been to one brought up in ruder and coarser surroundings.   A person habituated to the customs and civilization of a people where such prisons are tolerated, might suffer far less from such confinement than one reared under higher and more refined surroundings.   Health to the one might not be seriously injured, while to the other a permanent impairment could hardly be avoided.

Disgrace is a relative term.   What is such to one is not necessarily so to another, and when it applies to each, its effect, or measure, is great or small, as other conditions exist.

The actual money cost, to the appellee, of his imprisonment, if we do not look into the future, was less than $3,000.

What shall be the estimate of his good name?

Reparation in that respect, to the extent of reinstatement in appellant's service, was denied him upon his application for re-employment after his release, because, as testified by Mr. Jackson, his place had necessarily been filled during his absence.

What is a fair return for his injured health, or if his life be shortened because of the imprisonment, what sum of money will make that loss good?

Numerous questions may be asked that bear upon the question of what is just compensation in such a case, but no satisfactory answer to any of them can be made.

The law has provided that the jury shall decide the question, and unless their verdict is based upon undue partiality, passion or prejudice, or is such as to shock the conscience of the court, it must stand.

The judge before whom the cause was tried required nothing to be remitted from the verdict as a condition that it should not be set aside altogether, and it would be a mere assumption of superior wisdom in such respect for us to measure out a less sum and say that it is sufficient.

We might think that a less judgment would be enough, but it would be a guess that we are not called upon to make.

The judgment will therefore be affirmed.

MR. PRESIDING JUSTICE GARY.

I have great difficulty in assenting to the amount of damages awarded by the jury. That the imprisonment was under such circumstances as would seem incredible, if there was any contradiction of the narrative of the appellee, and that all the loathsomeness of it was of common knowledge in Mexico, and yet nothing was done or attempted to alleviate the hardships the appellee was enduring, goes far to excuse, if not to justify, an award of damages which is, I believe, without precedent in this State.

The instructions by the court as to what the law of Mex-

ico is, were errors committed in favor of the appellant. Foreign law is for the jury to find, though if proved in writing, the meaning of the writing is to be determined by the court.

Whether the writing contains the law is all that the jury can decide. On the contested facts the verdict of the jury is final.

MR. JUSTICE WATERMAN, DISSENTING.

It is manifest that the recovery had in this case can not be maintained, unless one could be sustained upon the record here presented, against Browne or Jackson, the agents of appellant, by whom all that it did was done.

There is no evidence that either Browne, Jackson or appellant were actuated by malice toward appellee; on the contrary, Browne and Jackson felt kindly toward him.

It is undisputed that on the morning of June 17th, the paymaster of appellant, upon examining the safe in the office of the company, reported that a package containing $8,000 in currency was missing therefrom; that appellee, Browne, Jackson and others, were informed of this, and diligent search was immediately made for the money, with the result that it was not found.

Jackson was the chief officer of the company in Mexico, and Browne was his assistant treasurer.

The home office of the company was 4,000 miles away. What, under the circumstances, was the duty of Jackson and Browne? Surely not, having failed to find the money, to fold their hands and say nothing.

Browne, who was informed of the loss before the arrival of Jackson, first ordered the doors locked, and they were locked by spring locks, thus fastening the office against entrance therein, but not against the exit of persons inside. Browne, having finished his examination of the office and safe, told the inmates of the office that he was going to get the general manager, Jackson, and that none of the inmates of the office, seven persons, should leave, or allow any one to enter until he returned.

This, it is said, was an imprisonment of appellee by appellant.

If properly construed by the inmates that they were thus commanded by Browne not to allow appellee to go out, it perhaps was. The situation, however, hardly comes within the rule by which an order to restrain is an imprisonment. The order, if so it was, was to seven men to restrain each and all of the seven. Can there be said to have been present the means or apparent means of enforcing such an order? Appellee was no more restrained than was each of those by whom his restraint was or could be enforced. In about half an hour Browne returned, accompanied by Jackson. Jackson then made a search, as Browne had done, asked appellee a few questions as to where he had been the night before, gave orders that no one should leave the room, saying that he was going out with Browne, and that the occupants of the office should remain there until he returned; he and Browne then went out. They were gone about an hour and a half; returning, they brought with them three men dressed in citizens' clothes; one of them was the chief of police, and two were detectives.

Appellee testified: "When they entered they went into the paymaster's office and instructed all that were in there to pass into the treasurer's room; in the course of five or ten minutes they called me in there. Mr. Jackson told me he wanted me to give a statement of every minute of my time from the time I had left the office the night before until I arrived there that morning, which I did. It was taken down in writing. A general question was asked me, and then I was sent into the next room, and then they called in three others. I don't know what happened when they were in there, but they came back in the next room; Jackson and Browne and those three men that had come with them remained in the paymaster's office about half an hour afterward."

Up to this point, what had Browne or Jackson done, not required by their duty, or of which appellee could complain?

Appellee testifies: " Then Browne came to the front room and told me to come back there. I went back with him, and he pointed to one of these men and said to me, ' Herbert, you will have to go with this man,' pointing to the man."

Without remonstrance appellee went with the police, and was with five others, employes of appellant—Francisco Duran, paymaster; Higinio Castelan, Luis Lopez and Juan Valencia, guards; Tirso Villanueva, bookkeeper, to whom the direction not to leave the office had been given—lodged in prison by the Mexican authorities.

It may be that Browne or Jackson asked the police to take appellee into custody. Browne and Jackson each deny that such request or direction was made, and no one testifies to such request. In the face of such denial, was the jury warranted in finding that appellant, by one or each of these two servants, either directly or indirectly, so requested or directed, when, if either did, appellee could easily have proven it by testimony of the Mexican police, who knew all that Browne and Jackson said and did?

There is authority to the effect that making a complaint before a magistrate, who issues a warrant under which a party is arrested, the warrant not being justifiable in point of law, does not make the complainant a trespasser, yet if the complainant point out the party to be arrested to the officer who has the warrant, such pointing out might make the complainant a trespasser. West v. Smallwood, 3 M. & W. 418; Austin v. Dowling, L. R., 5 C. P. C. 534.

If one presents an application to a court of competent jurisdiction, and the court adjudicating upon the law and facts, orders an arrest, which is afterward vacated as erroneous, the applicant is not liable in trespass. Cooley on Torts, Second Ed., 548; Landt v. Hilts, 19 Barbour, 289–291; West v. Smallwood, 3 M. & W. 417–420; Fischer v. Langbein, 103 N. Y. 84–93; Marks v. Townsend, 97 N. Y. 590–598; Lock v. Ashton, 13 Jur., 12 Q. B. 871; Langford v. Boston & Albany Ry. Co., 144 Mass. 431; Addison on Torts, paragraph 1032.

" Where a man is given into custody on a mistaken charge and then brought before a magistrate who remands him, damages can be given against the prosecutor in an action for false imprisonment only for the trespass in arresting, not for the remand, which is the order of the magistrate." Webb's Pollock on Torts, 265–267; Lark v. Bande, 4 Mo. App. 186; Johnson v. Morton, 94 Mich. 1–6.

A party who makes a charge before a magistrate, in consequence of which another is taken into custody, is not liable to an action for false imprisonment, because he does not set a ministerial but a judicial officer in motion. Webb's Pollock on Torts, 265; Hope v. Evered, 17 Q. B. Div. 338.

Where one causelessly procures the arrest of another he may, if he institutes or secures the institution of judicial proceedings against the arrested party, be liable in an action for malicious prosecution for all that the injured person suffers in consequence of such prosecution; but in an action for false imprisonment, he is liable only for what was done up to the time when, as a result of judicial action, the party is held; from that time, the imprisonment is by judicial authority, and by that alone. Lea v. Charrington, 23 Q. B. Div. 45; Veneman v. Jones, 118 Ind. 41–45.

Appellee and others, being taken in custody by the police, an examination was had in the Second Criminal Court of Mexico, with the following result.:

" Then the judge in view of the foregoing proceedings and considering that the *corpus delicti* of robbery has been proved, and there being evidence enough to indict Francisco Duran, Herbert B. Gehr, Juan Valencia, Higinio Castelan, Luis Lopez and Tirso Villanueva, he decided that, in accordance with the foregoing facts and of articles 168 and 255 of the Code of Penal Procedure, they are declared formally arrested, charged with the aforesaid crime; that this decree be made known to whom it may concern; that the accused be identified by means of photographs; that information be asked from the officer in charge of the records of the different times that the accused has been in jail, and that everything be done according to law."

Articles 49, 158, 159, 160, 168 and 255, of the Mexican Code, are as follows:

"ART. 49.    The author of a revelation does not contract any obligation which binds him to the judicial proceeding.

ART. 158.    When there is sufficient motive to suspect that a person is the author, accomplice or concealer of a crime, it is necessary to proceed to take his indicatory declaration.

ART. 159.    If the accused has been deprived· of his liberty the indicatory declaration must be taken within forty-eight hours from the time of his detention.    The infraction of this article shall be punished as indicated in article 1089 of the Penal Code.

ART. 160.    After exhorting the accused to divulge the truth, there shall be made to appear in the indicatory declaration his Christian name, surname, country of birth, residence, whether married or single, profession and age; and then he shall be questioned:

I.    As to whether he had had notice of the crime.

II.    In regard to the location or place where he was the day and hour when the crime was committed.

III.    What persons he was in company with.

IV.    Whether he knows the persons who are reputed to be co-authors, accomplices, or concealers.

V.    Whether he was with them before the perpetration of the crime.

VI.    All other acts and details which may lead to the discovery of the truth, antecedents and causes which gave occasion to the crime, and the circumstances under which it was executed.

ART. 168.    If the examinations show reason, according to this code, for the continued detention of the accused, the warrant based on the reasons for imprisonment shall be issued within three days.    The infraction of this article shall be punished according to article 1038 of the penal code.

ART. 255.    Formal or preventative arrest can only be ordered when the following requirements are met:

1.    When the existence of an unlawful act which merits corporal punishment is proved.

2. When the preparatory declaration of the person detained has been taken, and the person informed of the cause of his arrest, and who is his accuser, if there be one.

3. When, in the opinion of the judge, there are sufficient data against the accused to suppose him responsible for the deed."

This action on the part of the Criminal Court would seem to dispose of the question of whether the commission of a crime has been shown, and whether there was probable cause for charging the appellee with the same. In reference to this, it is to be borne in mind that while in the absence of evidence as to what the law of a foreign country is, it will, if a civilized State, be presumed that damages are recoverable for assaults upon the person; there is no presumption that the same rules prevail there as here as to what constitutes proof of the commission of an offense, or probable cause; and the finding of the Mexican court in this regard, it being shown to have had jurisdiction of the subject-matter and person, is conclusive as to what, to it, appeared. Black on Judgments, Secs. 825 to 829; C. & N. W. Ry. Co. v. Tuite, 44 Ill. App. 535-543; Thompson v. Ketcham, 8 Johns. 190; Mostyn v. Fabrigas, Cowp. 161; Male v. Roberts, 3 Espinasse, 163.

Neither Browne, Jackson nor appellant were in any way liable in an action for false imprisonment for what took place after the Criminal Court had remanded appellee. Evidence as to subsequent detention and the consequences thereof should not have been admitted.

The record fails to show that there was a malicious prosecution or accusation. Browne and Jackson, so far as is shown, did only what their duty required.

It is not shown to be the case in Mexico, and it certainly is not here, that one who gives notice to the police authorities of the commission of a crime, or even makes to a magistrate a formal charge against another, does so at the peril of being mulcted in damages if he honestly mistake as to the culprit.

The judgment of the Circuit Court should, in my judgment, be reversed and the cause remanded.