## BLACK v. CANADIAN PAC. RY.

### (District Court, W. D. New York. November 27, 1914.)

1. MALICIOUS PROSECUTION (§ 69*)—DAMAGES—EXCESSIVENESS.

Plaintiff, having been employed by defendant railroad company in the fall of 1911 as station agent in the Canadian Northwest at a salary of from $90 to $100 a month, obtained leave of absence in March, 1912, and afterwards resigned without returning to his station. Shortly thereafter he was arrested in Buffalo at the instance of one of defendant's detectives on the charge of being a fugitive from justice; it being claimed that his accounts with the railroad company were short and that he had fled the jurisdiction. When arrested, he protested his innocence, and his sister offered to deposit in any bank an amount sufficient to cover his alleged defalcation pending a re-examination of his accounts. The extradition proceeding was dismissed, however, on plaintiff's agreement to return to Canada and there go over his accounts; it being agreed that during the journey he should be treated as a free man, sleep in a sleeping car, have his meals in the diner, be treated as an ordinary passenger, and have medical treatment, if necessary, for an injured hand. As soon as the detective got him into Canada, however, he was thrust into jail, confined in a cell, refused an opportunity to communicate with his attorney or the American consul, was carried to destination in a coach, handcuffed, compelled to buy his own meals, sleep in the coach, and was refused medical assistance for his hand. On arriving at his destination he was promptly discharged. Defendant's traveling auditor, as a witness for the crown, admitted that there had been a mistake and that there was no case. Plaintiff applied to defendant for return transportation, which was denied, in violation of the previous agreement, and for nine months after he returned he was unable to obtain employment. He testified that he had lost weight and that his health was impaired from mental strain. *Held*, that a verdict awarding him $25,000 was not excessive.

[Ed. Note.—For other cases, see Malicious Prosecution, Cent. Dig. § 158; Dec. Dig. § 69.*]

2. MALICIOUS PROSECUTION (§ 67*)—COMPENSATORY DAMAGES—ELEMENTS.

The elements of compensatory damages in an action for malicious prosecution include loss of time, peril to life and liberty, injury to fame, reputation, and health, mental suffering, and decrease in earning power.

[Ed. Note.—For other cases, see Malicious Prosecution, Cent. Dig. §§ 155, 156; Dec. Dig. § 67.*]

3. APPEAL AND ERROR (§ 979*)—REVIEW—EXCESSIVE VERDICT.

The correction of an excessive verdict in a federal court is solely a question for the trial court on a motion for a new trial, the granting or refusal of which will not be reviewed on appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3871–3873, 3877; Dec. Dig. § 979.*]

At Law. Action by David J. Black against the Canadian Pacific Railway. Verdict for plaintiff. Defendant moves for a new trial. Denied.

George Clinton, Jr., of Buffalo, N. Y., for the motion.
Joseph Wechter, of Buffalo, N. Y., opposed.

MAYER, District Judge. [1] The action is for malicious prosecution, and the jury has rendered a verdict in favor of the plaintiff for the sum of $25,000. At the conclusion of the trial a motion was

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

made to set aside the verdict on several grounds, and has been disposed of, except in respect of the question as to whether the verdict is excessive. I have not the transcript of the testimony, but from my own minutes I think I can set forth an outline of the facts as they must be assumed to have been found by the jury. Indeed, there was practically no controversy as to the important facts, and the differences in the testimony were merely as to certain details.

Black obtained employment from the defendant in the fall of 1911 as a station agent at Wycliffe in the Canadian Northwest. His salary and commissions amounted to between $90 and $100 monthly. He was the sole person there in charge, and, in addition to the customary duties of an agent selling transportation tickets, he had charge of incoming and outgoing freight, also of the business of the Dominion Express Company, was responsible for three flag stations, received and transmitted the contents of telegrams by telephone to the telegraph office, was required to keep certain records in connection with a mine, and to perform certain duties in relation to freights of lumber from a lumber company, which made shipments over the line, and which sometimes, as the evidence shows, remitted direct to the head office of defendant at Montreal.

For a period of time during his incumbency Black had difficulty in obtaining the necessary stationery upon which to make his records, and for a time, at the beginning of his employment, he was compelled to carry the money received by him on his person, because defendant had not furnished him with a safe. It was his duty to make out certain reports on forms somewhat extensive in detail. Some of these reports were required to go forward on the 7th, 14th, 21st, and last day of each month, and were known as weekly reports, and were to be accompanied with such cash and checks as came into his hands. His monthly reports were a résumé of the business of the month, and were copied in impression copy books given to him for that purpose.

In detail the reports contained, not only those items which had to do with the collection of money, either in currency or checks, but also with certain purely record or bookkeeping entries, such as entries in regard to freight of the railroad, consisting of its own material. It was established beyond question that the only accurate method of ascertaining the correctness of the reports of Black was to check up his weekly reports, and check up in connection therewith on his actual receipt of moneys, and to take into account in any calculation those items where no money passed through his hands, and which related solely to bookkeeping or record entries.

In March, 1912, Black obtained a leave of absence for the purpose of attending the funeral of his father. He later returned, and on or about October 10, 1912, requested a leave of absence in order to enable him to visit his mother in Buffalo; it being believed that she was critically ill at that time. Under date of November 15, 1912, he communicated in writing with his superintendent, stating that he was delayed on account of illness, and in due course received his pay check for the month of October. In this communication he stated his correct address, and, having thereafter moved, he gave his new and cor-

rect address when he returned the receipted voucher for his pay. He decided not to return to the employ of the defendant, and obtained employment in Buffalo, and on and for some time prior to August 11, 1913, was employed at the Pierce Motor Works in that city.

On or about July 17, 1913, the index finger of his left hand was taken off in an accident at the motor works, and at the times hereinafter referred to the wound was still healing and required attention. On August 11, 1913, he was arrested at the Pierce Motor Works by a detective of the Buffalo police force, who was accompanied by one Cadieux, a detective of the defendant, on the charge that he was a fugitive from justice. The warrant obtained from the Buffalo court was based on appropriate papers, which, in effect, set forth that Black was charged with the larceny of $334.02 from the defendant company, that a warrant had issued from the appropriate county court in Canada, and that Black had fled the jurisdiction.

Black was then taken to the jail in Buffalo, where he remained until August 16th. When arrested he protested his innocence, and insisted that his accounts were right, but that, if there was any error, such error was due to inadvertence. He retained an attorney, and certain interviews and negotiations took place between his attorney, himself, and his sister on the one hand, and Cadieux and counsel for defendant on the other, although all of these parties were not present at all of these interviews.

It is insisted on behalf of Black that his sister offered to deposit the amount of his alleged defalcation in any bank in Buffalo named by defendant, pending a re-examination of his accounts. Defendant gave another version of the conversations in this respect, but apparently the jury concluded that the version testified to on behalf of Black was correct. As this offer was not accepted, the negotiations finally resulted in the following arrangement:

The proceeding in Buffalo was to be dismissed; Black was to go voluntarily and without process to Cranbrook, some 2,400 miles away, the county seat at which Judge Thompson of the Canadian court had issued his warrant, and there go over his accounts; throughout the journey Black was to be treated as a free man, and, according to his account, was to sleep in a sleeping car, and have his meals in a dining car, and, in a word, to be treated as an ordinary passenger; in addition he was to have medical treatment if the condition of his hand required; and the testimony of himself and his witnesses to the whole agreement is corroborated in every substantial particular by Cadieux. Cadieux, who seemed to be a well-mannered and kindly disposed man, had stated that he would accompany Black from Buffalo to Cranbrook.

It appeared, however, from a letter received in evidence toward the end of the trial, that this agreement was not intended to be carried out, for Cadieux had written to his chief (the head of the detective department of the railway), after the arrangement was made, detailing the situation and stating in substance, or by fair inference, that he would get Black to Canada and then that Black could be placed under restraint. The evidence fully warranted the conclusion that Black was to be tricked across the border on a promise which was to be broken.

It is hardly necessary to add that this scheme of deception was not made known to the reputable counsel who represented defendant in the matter.

On August 16, 1913, Cadieux and Black started for Toronto, Canada, and during that trip Black was not subjected to any physical inconvenience; but on arrival at Toronto, and in plain violation of the agreement, Black was thrust into the jail at the police station, confined there in a cell until the evening of August 19th, and during that time was not permitted to communicate with his attorney in Buffalo, or with the American consul at Toronto, and, more than that, was not able to obtain medical service, although he had requested the same. He paid for his own meals, and was compelled to undergo considerable hardship, so far as his physical comfort was concerned, not to speak of his great mental distress. Cadieux, pursuant to instructions, went elsewhere and left no word as to the arrangement with Black, and I am satisfied that it was intended that he should not leave word.

Thus a prisoner, cut off from communication with his friends, prevented from reaching the consular representative of his own country, treated in every way as if a criminal, he was taken in charge by another Canadian Pacific detective, named Newton, haled through the streets to the railway station, and there taken aboard of a day coach at about 9:30 in the evening. From the time Newton took Black in charge at the police station he handcuffed him, and on the train, where no sleeping accommodations were afforded to Black, Newton handcuffed his two wrists, and kept him in this condition, and would not remove the handcuff until the pain was so great that Black threatened to appeal to the passengers if Newton did not relieve him. At 1 o'clock in the morning Newton released the sore hand, but thereupon chained Black's right hand to the seat, and, with some few intervals, such as when Black went in to his meals, Newton kept Black chained to the seat day and night. Black requested the services of a doctor for his hand, but this was not accorded to him, and, without elaborating details, I may observe that while he was in Newton's custody Black was treated about as brutally and outrageously as one man can treat another, and worse, if anything, than if he had been a dangerous desperado.

At Winnipeg, Newton turned Black over to another Canadian Pacific detective, named Adams. Adams seems to have been a humane man, and made the remainder of the journey as comfortable as circumstances would permit, and obtained brief medical treatment for Black at a place called Brandon. It may be remarked, in passing, that on this journey with Newton Black did not obtain all of his meals.

Arriving at Cranbrook, Black was taken to the provincial jail there, and remained in the jail until about September 17th. During his incarceration in the jail he was permitted to be out of his cell during the day, although of course, detained in the jail, and his impression copy books were placed at his disposal; but no information was given to him in respect of what items it was claimed constituted the details of his alleged defalcation.

When the case came on before Judge Thompson on September 17th, the judge dismissed the same on the showing of the crown, and there

was not even any necessity of calling Black to the stand. The traveling auditor of defendant, a witness for the crown, admitted in substance to Judge Thompson that a mistake had been made and that there was no case. Black had paid $50 to a local attorney to represent him, and after his acquittal applied to the proper official of the defendant for transportation home in accordance with the agreement, made in Buffalo with Cadieux, that if the charge turned out to be erroneous then Black was to have transportation back to Buffalo. The transportation was refused, and Black, on his own resources, in due course of time returned to Buffalo.

This outline, in cold type, hardly does justice by way of description to the experiences which this man was compelled to undergo through no fault of his own, and through a course of conduct manifestly careless and reckless on the part of defendant from the beginning to the end. For nine months after Black returned home he was unable to obtain employment, and after that he seems to have taken any job he could in order to earn a living for his family. He testified that he had lost weight and that his sleep was restless, and certainly his appearance justified the conclusion that he had suffered some severe mental strain.

Phillips, the traveling auditor, was in court at this trial, but did not take the stand. The defendant did not produce, upon its behalf, the weekly reports, nor was any attempt made to controvert, not merely the innocence of Black, but lack of probable cause, by showing that he had converted a single penny to his own use. It appeared that the auditor had merely examined Black's books at the Wycliffe station, and had there found an aggregate of errors and omissions mainly of a bookkeeping character, both in favor of Black and against him. In other words, Black had made certain mistakes by which he had credited himself with more than he was entitled to, and had made certain other mistakes by which he had charged himself with more than he was liable for. In some of his monthly reports his detailed items were correct, but his additions were erroneous, so that in this regard he had clearly and honestly shown what had come into his hands, but had made some purely clerical errors in addition—for instance, one as trifling as 76 cents in adding a column of figures.

Further, one of the largest items charged against him was, as I recall, a matter of $554.85 in relation to waybills for freight of the lumber company, where the money did not pass through his hands, but, on the contrary, was remitted direct by the lumber company to the head office at Montreal. A person exercising, not merely ordinary intelligence, but the slightest degree of intelligence, after examining Black's impression copy books, would at once conclude that if the man had made any mistakes, and had thereby received $334.02 of defendant's money which did not belong to him, then those mistakes must have been the result of clerical errors or omissions, without any intent to do a wrong.

The total mistakes on one side of the account made by Black aggregated $1,083.58, while on the other side of the account, and against himself, his mistakes footed up $749.56. A man intending to steal money hardly makes a mistake against himself of nearly $800. The

very least that should have been done, before the warrant was issued and the arrest made, was to check up against the reports and accounts at the head office in Montreal, for it must be concluded on the evidence that that checking up would have demonstrated that Black had not stolen anything. Upon this state of facts the jury was charged that it would award compensatory, but not punitive, damages, as actual malice had not been shown.

[2] The elements of compensatory damage include, among other things, loss of time, peril to life and liberty, injury to fame, reputation, and health, mental suffering, and decrease in earning capacity. See 26 Cyc. (Ed. 1907) p. 62 et séq. This case belongs to a class where the jury is peculiarly the proper judge of the amount of damages, and, before a verdict may be set aside or remitted in part, the court, under well-known rules, must be satisfied that the result was influenced by passion or prejudice, or that the amount was grossly disproportionate to the wrong inflicted.

Neither on the evidence, nor because of the manner and method of the trial, can I say that the verdict was arrived at by other than calm, orderly processes. The extraordinary story of plaintiff turned out to be true, and was told in quiet, dignified fashion, without any attempt on the part of himself or his attorney to be dramatic, as sometimes happens in a courtroom. The jury, if observation of faces and manner counts for anything, was an attentive, sober-minded, and hard-headed set of men.

[3] The correction of an excessive verdict is solely a question for the trial court on a motion for a new trial, the granting or refusing of which will not be reviewed by the federal appellate courts. (Erie Railroad Co. v. Winter, 143 U. S. 60, 75, 12 Sup. Ct. 356, 36 L. Ed. 71; Northern Pacific R. R. Co. v. Charless, 51 Fed. 562, 579, 580, 2 C. C. A. 380); and therefore I have considered it desirable to state somewhat fully, not merely the testimony, but as well the human characteristics, of the trial.

The verdict is substantial, but cases of this character stand on their own facts, as illustrated by the verdicts in malicious prosecution actions collated in 26 Cyc. pp. 65, 66. As far back as the Michaelmas term of the Court of Common Pleas in 1779, Sir William Blackstone and his associate judges said:

"That in cases of tort the court will not interpose on account of the largeness of the damages, unless they are so flagrantly excessive as to afford an internal evidence of the prejudice and partiality of the jury."

And the court sustained a verdict for £10,000. Leith, Baronet, v. Pope, W. Bl. 1327.

In Mexican Central Railway Co. v. Gehr, 66 Ill. App. 173, a verdict for $40,000 was sustained in favor of a railroad employé rceiving a salary of $115 per month, who was wrongfully imprisoned in Mexico.

I have not been able to find any case in the books, except the Leith and Gehr Cases, which approaches in gravity the case at bar, and in some respects this case is more serious than the Gehr Case. Mr. Justice Shepard, delivering the opinion of the court in the Gehr Case, said:

"The only remaining question which we feel called upon to discuss is that of the amount of judgment recovered. When verdicts are so large, it is always a subject of difficulty, there being no possible rule by which to measure compensation in such cases. * * * What shall be the estimate of his good name? * * * What is a fair return for his injured health, or, if his life be shortened because of the imprisonment, what sum of money will make that loss good? Numerous questions may be asked that bear upon the question of what is just compensation in such a case, but no satisfactory answer to any of them can be made. The law has provided that the jury shall decide the question, and unless their verdict is based upon undue partiality, passion, or prejudice, or is such as to shock the conscience of the court, it must stand. The judge before whom the cause was tried required nothing to be remitted from the verdict as a condition that it should not be set aside altogether, and it would be a mere assumption of superior wisdom in such respect for us to measure out a less sum and say that it is sufficient. We might think that a less judgment would be enough, but it would be a guess that we are not called upon to make."

In the case at bar two of the important elements of damage were mental suffering and injury to reputation. Upon a state of facts such as here disclosed, can it be said that the mental distress of an intelligent, industrious, and honest man earning $1,200 per annum is to be measured by a standard different than would apply to a man of larger earning capacity? Or can any one tell with exactitude the extent to which a man's reputation is injured by a wrongful prosecution, and in such a way, among other things, as to interfere anonymously, as it were, with his opportunity to earn a living in his accustomed vocation or walk of life. Blunk v. Atchison Co. (C. C.) 38 Fed. 317; Sheldon v. Carpenter, 4 N. Y. 579, 55 Am. Dec. 301; Wheeler v. Hanson, 161 Mass. 370, 37 N. E. 382, 42 Am. St. Rep. 408; Ambs v. Atchison Ry. Co. (C. C.) 114 Fed. 317.

Indeed, if there were to be distinctions in such respects in cases of this character, they would more likely be in favor of the humbler man, because he probably would have much greater difficulty in overcoming the effects of a prosecution than would a man of greater force and power.

For the reasons outlined, the verdict will not be disturbed, and the motion for the new trial is denied.