EMILY A. BOGUE et al.

v.

ROBERT A. FRANKS.

*Opinion filed October 25, 1902—Rehearing denied December 9, 1902.*

1. DURESS—*deed or mortgage obtained by duress may be ratified.* A deed or mortgage obtained by duress is not, in general, void, but merely voidable, and cannot be avoided if ratified after the coercing influence has ceased to operate.

2. SAME—*what is not duress.* A mortgage by husband and wife upon their homestead cannot be said to have been obtained by duress, even though the deplorable condition of the husband's business affairs and the danger of his being arrested for embezzlement may have aided to influence the wife to sign the mortgage, where, although the mortgagee was one of the victims of the husband's dishonesty, he was in no way connected with the proceedings for the arrest, and did not seek to influence the wife's action.

*Bogue* v. *Franks,* 100 Ill. App. 434, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on writ of error to the Circuit Court of Cook county; the Hon. CHARLES G. NEELY, Judge, presiding.

HAMILTON B. BOGUE, Jr., and PLINY B. SMITH, (JOHN S. MILLER, of counsel,) for appellants.

GARDNER & STERN, for appellee.

Mr. JUSTICE BOGGS delivered the opinion of the court:

The appellee filed his bill in chancery in the circuit court of Cook county to foreclose a trust deed executed on the 23d day of October, 1894, by the appellants, Emily A. Bogue and her husband, H. B. Bogue, whereby they mortgaged certain premises on Greenwood avenue, in the city of Chicago, to secure their note in the sum of $18,000, payable to their own order and by them endorsed to one Henry Phipps, Jr., and by said Phipps endorsed to the appellee. The appellants answered the bill, setting up in detail and at great length facts and circumstances

intended to develop as a defense to the note and mort-
gage; that the makers thereof, the appellants, were in-
duced to execute them by the fraudulent, oppressive and
unconscionable conduct of said Phipps, Jr., and others,
for whose benefit the mortgage was executed, at a time
when the necessities of the appellants and the stress
of their circumstances were such that they were under
moral duress, as said Phipps and others well knew, and
of which said Phipps and others took advantage, and
thereby coerced the appellants to execute the note and
mortgage. Replication was filed to the answer, and the
cause was referred to the master. The parties produced
their proofs, and the master reported the same, together
with his conclusions, to the court. The findings of the
master were adverse to the defense which the appel-
lants sought to interpose, and they filed seventy-nine
objections to the master's report. These objections were
heard by the chancellor and overruled, and at the April
term, 1900, of said court a decree was entered awarding
foreclosure, as prayed in complainant's bill. On the 29th
day of June, 1901, the appellants sued out a writ of er-
ror from the Appellate Court for the First District and
brought the record of the proceedings in the circuit court
before the Appellate Court for review. The Appellate
Court affirmed the decree of the circuit court, and the
cause is before us on appeal from such judgment of af-
firmance.

The deed of trust or mortgage, and the note for $18,000
secured thereby, were executed in the course of a settle-
ment of the affairs of the firm of Bogue & Co. and said
Henry Phipps, Jr., and others. The master found the
charge of oppression, undue advantage or moral duress
had not been supported by the evidence, and that each
of the appellants had voluntarily executed the mortgage,
and without improper restraint. This finding, we think,
was the correct conclusion arising from the facts estab-
lished by the proof.

In 1888 the appellant H. B. Bogue, his brother, George M. Bogue, and one Henry W. Hoyt, were engaged in business as real estate and investment agents and brokers, in the city of Chicago. The said Henry Phipps, Jr., John Walker, Charles L. Strobel and Henry A. Gardner (all of whom will hereinafter be designated as Phipps *et al.*) desired to act jointly in the business adventures of purchasing and selling real estate in and about the city of Chicago. Bogue & Hoyt desired also to engage in such enterprises, and the parties came to an agreement, by which Bogue & Hoyt purchased several tracts of land and pieces of city property, in which Phipps *et al.* had two-thirds interest and Bogue & Hoyt a one-third interest. Hoyt died in 1891, and the Bogues (appellant H. B. Bogue and his brother, George M.,) became the owners of all of Hoyt's interest in the affairs and property of the firm, including his interest in the enterprises in which Phipps *et al.* were interested, and they continued the business under the firm name and style of Bogue & Co. Afterwards a number of other pieces of real property were purchased by the Bogues for the account of themselves and said Phipps *et al.* in the proportions before mentioned. A tract of land was purchased in Burlington Heights, in which said Henry Phipps, Jr., alone and the Bogues were interested. The Bogues were experienced real estate men, actively engaged in that business. All of these purchases were made through them, and it was arranged between the members of the syndicate that whenever it became advisable the property should be improved and placed upon the market for sale by the Bogues, as the agents of the syndicate. In the purchase of these various properties two-thirds of the cash payment was paid to the Bogues by Phipps *et al.*, as the Bogues had charge of the details of the purchases. In most instances notes and trust deeds were given for the deferred purchase money by the party taking title for

the syndicate, and as these notes matured Phipps *et al.* sent to the Bogues the two-thirds due from them with which to pay said notes, and the Bogues looked after the payment' of the notes or cancellation of the indebtedness and the release of the trust deeds, etc. The properties, or portions thereof, were sold by the Bogues for the syndicate from time to time. They received all cash payments, and notes and mortgages were taken by them from the purchasers for deferred purchase money. These matters were in charge of the Bogues, as agents for the syndicate, and the collection of these obligations was made by the Bogues.

In the early part of the year 1893 the firm of Bogue & Co., and also the individual members of the firm, were in financial straits. In June of that year the Bogues sought to sell their interests in the syndicate properties to Phipps *et al.*, as a means of raising money. Said Phipps and Walker resided in Pittsburg, Pennsylvania. The Bogues prepared a statement of the syndicate affairs and properties and sent it to Pittsburg. It appeared from this statement that Phipps *et al.* were indebted to the Bogues. Phipps *et al.* then purchased all of the syndicate properties and paid Bogue & Co. for their interests therein, and also paid Bogue & Co. the amount appearing from the statement to be due to them. Afterwards Phipps *et al.* were advised that the Bogues, in the transaction of the affairs in which the syndicate were interested, had misappropriated funds belonging to the syndicate, had falsely represented the amounts paid for properties purchased for the syndicate, had appropriated to their own use moneys sent by Phipps *et al.* to make payments on properties purchased and left unpaid notes given for such purchase price, and had committed other wrongs of like character, to the injury of Phipps *et al.* They procured one Jacob Beck, a former employee of Bogue & Co., to examine the papers and books of the Bogues, and Beck concluded his examination in October,

1894, and his report was confirmatory of the information which Phipps *et al.* had received with reference to the frauds, misappropriations and wrongs' perpetrated by the Bogues in the various transactions in which the syndicate was interested. On October 16, 1894,'and while Beck was engaged in the examination of the papers and books, the Bogues were both arrested and required to give bail, on a *capias* sued out by C. C. and C. J. Bour, for a failure to pay over certain trust funds which had been entrusted to them and which they had appropriated to their own uses. George M. Bogue had been served with a rule to distribute $14,000 which had been placed in his hands under an order of the circuit court of Cook county appointing him receiver of the Chicago Life Insurance Company. This money the Bogues, acting together, had misappropriated and were unable to produce in answer to the rule of the court, and contempt proceedings and the arrest of George M. Bogue were threatened.

The Bogues held title to considerable real estate, but it was all mortgaged for the full amount that could be obtained thereon, and unpaid judgments for considerable sums stood against them. A conference between the Bogues and Beck resulted in a suggestion that an effort be made to induce Phipps *et al.* to buy the equities of the Bogues. A written statement was made by George M. Bogue and Beck showing the lands in which the Bogues had equities, George M. Bogue's estimate of the value of the lands, the encumbrances thereon and Bogue's estimate of the values of the equities; also the claims in favor of Phipps *et al.*, based upon the misappropriations and frauds of the Bogues as claimed by Beck, and certain claims for commissions and services, presented by the Bogues as set-offs to the claim presented by Beck in favor of Phipps *et al.* Beck, at the request of the Bogues, took this statement to Pittsburg to lay before Phipps *et al.* and to induce them to purchase the equities of the Bogues. Mr. Walker, of Phipps *et al.*, returned to Chi-

cago with Beck, and negotiations were entered into which resulted in the purchase by Phipps *et al.* of all the equities of the Bogues. In these negotiations the values of the equities in the properties owned by the Bogues, the alleged misappropriations of the moneys of the syndicate by the Bogues, and of the other alleged fraudulent transactions of the Bogues in connection with the affairs of the syndicate, and the counter-claims of the Bogues for commissions and services, were all discussed, considered and settled by the parties. Claims of Phipps *et al.* to the amount of $258,000 were adjusted at $165,000. Counter-claims of Bogue & Co. in the total of $53,000 were settled at $4500, leaving due Phipps *et al.* $161,500. A contract was entered into to the effect that Phipps *et al.* should take the equities at $206,500, should satisfy their demand of $161,500 and should pay the Bogues $45,000 in cash for all the equities held by them, including the equity of the appellants in the Greenwood avenue property involved in this proceeding. The agreement provided that the Bogues should relieve all the equities from the liens of the judgments against them, individually and as co-partners. This contract was entered into on the 23d day of October, 1894. The Greenwood avenue property, which the contract required should be conveyed to Phipps *et al.*, was the homestead of the appellants and the title thereto stood in the name of appellant Emily A. Bogue, she having received the same by conveyance from her husband and co-appellant, H. B. Bogue. This homestead property was then encumbered by two mortgages. At the request of H. B. Bogue, Phipps *et al.* agreed to accept a third mortgage on the said Greenwood avenue property to secure the payment to them of $18,000, instead of taking a conveyance of the equity in that property. The Bogues then entered upon the work of removing liens upon their properties which the contract with Phipps *et al.* required them to remove, and adjusting other matters relating to the titles to their

equities, in order to enable them to transfer their equities to Phipps *et al.* in accordance with their contract.

On the said 23d day of October, 1894, the day on which the agreement was reached between the Bogues and said Phipps *et al.*, a note was prepared and signed by the appellants, in and by which they promised to pay to their own order the sum of $18,000 five years thereafter, with interest thereon at the rate of seven per cent per annum, payable semi-annually  The same parties then executed and acknowledged a trust deed in the nature of a mortgage, whereby they mortgaged said Greenwood avenue property to secure the payment of said note.   There is nothing in the evidence to show that Phipps *et al.* had any part whatever in the execution of these instruments or participated in any way therein.   This is the note and the trust deed here sought to be foreclosed.

The Bogues did not complete the matters necessary to enable them to comply with their agreement with Phipps *et al.* until the 2d day of February, 1895, nor did they deliver the note and trust deed to Phipps *et al.* until that date.   It seems, however, that at the time of the execution of the note and trust deed by the appellants the contempt proceedings against George M. Bogue, as receiver of the said life insurance company, were being pressed, and that the note for $18,000, and the mortgage securing the same, were, by the agreement of the Bogues and the representatives of the persons who were interested in the funds held by said George M. Bogue as receiver, placed in the custody of Judge Tuley, of the circuit court, to hold as security for the money which the said Bogues had misappropriated from the funds in the hands of said George M. Bogue, as receiver of the said life insurance company.   The note and mortgage remained in the hands of Judge Tuley until the 2d day of February, 1895, on which day Phipps *et al.* and the Bogues met and consummated their agreement. The appellant Emily A. Bogue, in writing, authorized her hus-

band and co-appellant, H. B. Bogue, to deliver the note
and trust deed, which were in the hands of Judge Tuley,
to said Henry Phipps *et al.* upon the payment of $18,000
to him or to whom he should direct. He procured the
note and mortgage to be delivered to Phipps *et al.*, who
paid therefor the sum of $18,000 in cash, being the sum
mentioned in the note. Of this amount $14,000 was ap-
propriated to the payment of the amount due from George
M. Bogue, receiver of the said life insurance company,
and the remainder ($4000) was paid in a check for that
amount, drawn payable to the appellant Emily A. Bogue.
Subsequently the note secured by the trust deed was
assigned to the appellee for a valuable consideration.
The appellants were notified of the assignment. The
semi-annual interest payments were for a time met and
discharged by the appellants, but they finally became in
arrears. The appellee, at their request, consented to the
sale of seventy feet off of the east side of the mortgaged
premises, whereby the appellants were enabled to reduce
the prior encumbrances in the amount of $18,375, and con-
sequently reduced the annual interest charge on that
amount. At their request he also extended, at several
times, the time of payment of the semi-annual interest
due to him, but they finally ceased to pay interest, and
he, acting under a clause in the mortgage authorizing
such course to be taken, declared the entire indebtedness
to be due and filed the bill herein.

The note and trust deed were delivered on the 2d day
of February, 1895. No complaint was made that they
were not in every respect valid and effectual until the
amended answer was filed to the bill in the cause, on
the 24th day of November, 1897, more than two years and
eight months after the delivery of the note and mort-
gage. The appellants, during that interval, treated the
debt and the trust deed as valid by paying interest on
the indebtedness, by asking and obtaining extensions of
time in which to make further payments of interest, and

by asking and obtaining the benefit of the release of a portion of the premises described in the trust deed from the lien thereof. Even if obtained by duress, a deed or mortgage is not, in general, void, but only voidable, and may be ratified, and can only be avoided by prompt action on the part of the injured party after the restraint has been removed, and cannot be avoided if ratified after the coercing influence has ceased to operate. (*Eberstein* v. *Willets*, 134 Ill. 101; 10 Am. & Eng. Ency. of Law,—2d ed.—334.) There may be cases where the severity of the duress is so great that the person under its influence is converted into a mere automaton for the purpose of registering the will and obeying the command of the person exercising the coercive power, in which cases it may be the contract or act should be held null and void, (10 Am. & Eng. Ency. of Law,—2d ed.—334, 338,) but all semblance of restraint or duress of that degree is refuted by the proof in the case at bar. The master found there was no evidence to show that any influence amounting to any degree of duress operated to induce the execution of the mortgage. This finding was approved by the chancellor, and we find it to be correct.

It is confessedly true the financial affairs of the Bogues were in a desperate condition when they contracted, in October, 1894, to sell their equities to Phipps *et al.*, and to account in such sale for many of the frauds and wrongs which Phipps *et al.* had suffered at their hands. Not only were their property affairs in desperate straits, but they were in danger of imprisonment for the misappropriation of funds which they had received in trust capacities, but Phipps *et al.* had no connection whatever with the proceedings which threatened the personal liberty of the Bogues. Phipps *et al.* believed the Bogues had wronged and defrauded them, and the evidence established that that belief was well founded. The master specially found that the Bogues had converted to their own use large sums of money belonging to the

funds of the syndicate; that they had used for their own purposes more than $30,000 sent them by Phipps *et al.* to be paid on their (Phipps *et al.*) two-thirds of the purchase price of properties, and left the properties encumbered with the debts which the moneys so sent them were intended to discharge; that one piece of property purchased by Bogue & Co. for the syndicate was charged to the syndicate at $100,000 in excess of the amount actually paid for the property; that in another instance, in connection with a sale of property to the syndicate, the Bogues were allowed a private interest to the extent of $40,000 in the capital stock of an incorporated company, which they did not make known to Phipps *et al.*; that they charged the syndicate, in another transaction, $10,-000 above the net cost to the Bogues of property purchased for the syndicate, and also charged the syndicate an excess of $42 per acre above the actual cost on 494 acres of land purchased for the syndicate. The evidence sustained these findings. Counsel for the appellants do not otherwise contend, but say such claims of fraud are unrelated to the alleged duress exercised upon the appellants, and particularly the appellant Emily A. Bogue, and further seek to excuse such frauds on the part of the Bogues by insisting that it appeared the transactions in which the fraudulent acts occurred yielded a profit to the syndicate over and above the frauds.

The claims of Phipps *et al.* presented in the negotiations with the Bogues amounted to $258,000. The Bogues presented counter-claims for alleged commissions and services amounting to $53,000. The negotiations resulted in reducing the claims of Phipps *et al.* in the sum of $93,000, which circumstance alone goes far to remove all imputation that the Bogues were under moral duress, and were forced by the circumstances which surrounded them to accept whatever terms Phipps *et al.* were willing to grant. It is true, the claims presented by the Bogues were reduced from $53,000 to $4500. These claims were

for services and commissions alleged to have been earned in transacting the affairs of the syndicate; but when it is remembered that the Bogues had previously presented to Phipps *et al.* an account of what they claimed to be due them for their services and commissions, and that the same had been paid, the conclusion at once arises that these latter claims were mere afterthoughts, invented for the purpose of offsetting, as far as possible, the liabilities of the Bogues to Phipps *et al.* which had been disclosed by the examination made by Beck of the books of the Bogues.

Phipps *et al.* exhibited no disposition to force or hasten the sale and conveyance of the equities to them by the Bogues, or to oppress them. The contract, as concluded between them, required the Bogues should convey the Greenwood avenue property (the mortgaged property) to Phipps *et al.*, but at the request of the Bogues this mortgage or trust deed was taken thereon instead of an absolute conveyance. After an agreement had been arrived at as to the value of the equities of the Bogues, the amounts which the Bogues should account for to Phipps *et al.*, and the amount of cash to be paid to the Bogues for their equities, the matter was allowed to stand until the Bogues could so arrange their affairs as to enable them to comply with the contract upon their part. Something more than three months was occupied by the Bogues in so arranging their matters. During the interval between the formation of the agreement, in October, and its consummation, in February, the Bogues sold several of the equities which they had contracted to sell to Phipps *et al.* These sales were reported to Phipps *et al.*, who consented thereto and ratified them, and gave the Bogues the benefit of the increase obtained by the sales over the valuation placed upon the equities by the agreement to sell them to Phipps *et al.* By these sales the Bogues profited to the extent of $5000 or more.

Phipps *et al.* had no connection with the judicial proceedings which threatened the liberty of the Bogues, nor did they say anything to the appellant Emily A. Bogue, nor does it appear from the record they directly or indirectly influenced or sought to influence her to sign the note or mortgage. The parties who had instituted the proceedings which looked to the imprisonment of her husband had no connection with Phipps *et al.* and no interest in the mortgage, and, so far as this record shows, did not know that the mortgage was to be executed. The deplorable condition of her husband's business affairs, and the danger in which he stood of being imprisoned, may have aided in inducing Emily A. Bogue to sign the mortgage on their homestead; but that does not constitute duress, legal or moral.

The judgment of the Appellate Court must be affirmed.

*Judgment affirmed.*