# The News Publishing Company v. The Associated Press, et al.

## Gen. No. 11,289.

1. MOTION TO DIRECT VERDICT—*when, should be denied.* A motion to direct a verdict should be denied where the evidence of the plaintiff fairly tends to support the cause of action alleged.

2. ASSOCIATED PRESS—*nature of obligations of.* Held, from the facts in evidence in this case, that the Associated Press was on and prior to April 7, 1897, of such a character and its obligations to the public such as to impress it with a public interest, and, therefore, to require it to render news service which it had contracted to give to one of its members

upon the same terms and conditions that it rendered like service to other newspaper publishers.

3. TORT—*ignorance of law does not excuse.* An act tortious in character is none the less so because at the time of the commission of such act there was no adjudicated case defining and fixing the character of such act as tortious.

4. FOREIGN LAW—*presumption as to.* In the absence of proof, the presumption is that the law of a sister state is the same as that of Illinois, and a contention that the law of a sister state is different from the law of Illinois must be supported by allegation and proof.

5. . DURESS—*what constitutes.* Where a newspaper publisher seeks a contract for news service from the Associated Press and is told that it cannot obtain such a contract except upon terms which were in excess of those ordinarily imposed by such association, a compliance with such exactions, in order to obtain such service, which was indispensable to its business, is deemed to have been obtained under duress and will not defeat an action of tort.

6. RESCISSION OF CONTRACT—*when, not essential to maintenance of action of tort.* A right of action in tort exists against a public news agency in favor of a newspaper publisher for the tortious act of such news agency in refusing to render service to such publisher without payment by it of charges in excess of those required of its other members, without rescinding the contract made in conformity with such exactions, inasmuch as the action is based, not upon the contract, but upon the tortious act of such agency.

7. CROSS-ERRORS—*what questions cannot be raised in absence of.* In the absence of cross-errors, it cannot be urged upon appeal that guaranties received in evidence over appellee's objections were improperly admitted because the signatures thereto and the authority for such signatures were not sufficiently established.

Action on the case for conspiracy. Appeal from the Circuit Court of Cook County; the Hon. JOHN L. HEALY, Judge, presiding. Heard in this court at the October term, 1903. Reversed and remanded. Opinion filed May 26, 1904.

GREGORY, POPPENHUSEN & McNAB, for appellant.

WILSON, MOORE & McILVAINE, for appellees.

MR. JUSTICE WINDES delivered the opinion of the court.

Appellant, a Wisconsin corporation, brought an action on the case against the Associated Press, an Illinois corporation, Victor F. Lawson, the president, and Frank B. Noyes and Charles W. Knapp, directors respectively of the Associated Press, the appellees, omitting said Knapp, to recover dam-

ages by reason of an alleged unlawful combination and conspiracy of appellees and said Knapp, whereby appellant was compelled to pay for news service to be furnished to appellant's daily paper, The Milwaukee News, the sum of $10,000, and to assign and surrender to said Associated Press certain guaranties held by appellant and executed by the publishers of the New York Herald, New York Tribune, New York Sun and New York Times, that the United Press, a news service association, a rival in business of said Associated Press, would perform its contract, whereby it agreed to furnish a news report for the term of five years from March 24, 1894, to appellant, and thereafter, until terminated by one year's notice from said United Press. No service was had upon Knapp; the suit was discontinued as to him, and pleas of not guilty were filed by the other defendants. A jury trial resulted, at the close of the plaintiff's evidence, on motion of defendants' counsel, in a verdict for the defendants, which was directed by the court, and judgment thereon, from which this appeal is taken.

The general and controlling question presented by the record is whether the Associated Press, a corporation whose business was to gather and accumulate, sell, supply and distribute news reports to newspapers desiring to purchase the same, said business being public in its nature and impressed with a public interest, was bound to furnish the appellant with reports of the news without discriminating against it, that is, without requiring appellant to pay in excess of other newspaper publishers for the same news reports the sum of $10,000 and to surrender to the Associated Press the said guaranties, which, it is claimed, were worth to appellant at least $8,000 more.

There being no conflict in the evidence, and the court having directed the jury to find a verdict for the appellees, it is well settled that if the evidence on the part of appellant fairly tends to support its case, the motion to direct a verdict should have been denied. Offutt v. World's Col. Exp'n, 175 Ill. 472; I. C. R. R. Co. v. Heisner, 192 Ill. 571–3.

The facts appearing from the record are in the main as

follows: March 24, 1894, the appellant was engaged in publishing a daily afternoon paper at Milwaukee, Wisconsin, known as the Daily News, to do which it was necessary to have telegraphic news. To get this news appellant that day entered into a contract with, and on March 26, 1894, it became a member of the United Press, an association organized under the laws of Illinois for the purpose of collecting and distributing news to newspapers throughout the United States. By the terms of this contract the United Press agreed to deliver to appellant for continuous use in its paper a leased wire daily news report, for which appellant agreed to pay $50 per week in advance, the agreement to continue five years from its date, and thereafter until terminated by one year's notice in writing from the United Press to appellant or to the Germania Publishing Co., which was also engaged in the publication of an afternoon newspaper in Milwaukee, and was a party to said agreement. Afterwards, on April 2, 1894, said United Press entered into an agreement of guaranty with appellant and said Germania Publishing Co., by which the United Press guaranteed " that in the event of there being hereafter made a working arrangement, combination, or any other plan of cooperation with any other newsgathering organization, through the operation of which it shall retire from active business in the west, or should it so retire from any other cause or reason whatsoever, The News Publishing Company and The Germania Publishing Company shall be protected in every way and the continuance of their telegraphic services permanently arranged for on the same basis of quality, quantity and cost as they now receive or as applies to other English and German evening papers in the city of Milwaukee."

Following the signature of the United Press and apparently a part of this agreement, is the following further guaranty signed as follows, to wit:

" In consideration of the parties of the first part entering into the above agreement, we do hereby guarantee the per-

News Publishing Co. v. Associated Press.

formance by the party of the second part of the obligations imposed on it by the terms of the above agreement.

For the Herald—W. C. RIECK.

For the Tribune—D. NICHOLSON, Acting Publisher.

For the Sun—C. A. DANA, President.

The N. Y. Times Pub. Co.—G. R. MILLER, President, GEO. F. SPINNEY, Treasurer."

At the time of making the contract of March 24, 1894, and when said guaranty was executed, the appellee, the Associated Press, a corporation organized under the laws of Illinois, for the purpose of buying, gathering and accumulating information and news to supply, distribute and publish the same, and for other purposes not material to be mentioned, was a rival news agency to the United Press, had its principal office in Chicago, and was serving about 400 newspapers, which was about the same service that the United Press did. These news agencies continued as rivals until March 31, 1897, when the United Press, by reason of the bitter rivalry between the two agencies, failed in business, made an assignment for the benefit of creditors, and gave notice to appellant that its news service would be discontinued after the night of April 7, 1897. No other notice as to the termination of the contract was given. There then remained no other practicable means open to appellant to get the news necessary for the publication of its paper, except to get it from the Associated Press. After April 7, 1897, appellant received no further news service from the United Press. Immediately after receiving said notice, Melvin A. Hoyt, the president of appellant, went to New York and made repeated efforts to see and make some arrangement with the different parties who had guaranteed the performance of its agreement with the United Press, but could accomplish nothing in that direction. He then entered into negotiations with the appellee Lawson, who was president of the Associated Press, for the purpose of securing a news service from it. The negotiations extended over a period of some two days, and resulted in Mr. Hoyt's making, as president of appellant, an application to the board of directors of the Associated Press at New York

city for a "B 1 Membership" in the Associated Press on payment of $10,000 in cash, or $5,000 in cash and a note of $5,000, running one year at six per cent interest, Mr. Lawson having told Mr. Hoyt previously that the Associated Press could render said news service to appellant upon condition of the payment of $10,000, and a further condition that he would surrender the guaranties of said four New York papers held by appellant, and that the service could be rendered only on a compliance with said conditions, besides the payment of the regular charges of the Associated Press for the services to be rendered. Said application was delivered by Mr. Hoyt to Mr. Lawson, and by the latter presented on April 7, 1897, to the board of directors of the Associated Press, then in session in the city of New York, and the board on that day passed a resolution to the effect that a contract for said news service be issued to appellant, its name be placed upon the membership roll of the Associated Press, with the proviso, however, that the said sum of $10,000 agreed to be contributed by appellant should be held in trust by the Associated Press to be distributed by a form of arbitration, to be agreed upon as specified in the resolution. After the passage of this resolution, on the same day and at the offices of the Associated Press, Mr. Hoyt had a conversation with Mr. Lawson, which the former thus states in his testimony, to wit: "Mr. Lawson said that it had been decided that contracts should be issued to the Daily News and to the Germania, and I told him I did not know, that I did not come prepared to make a settlement or anything of that kind. I did not know what I wanted to do about it, and he said the matter could be held open; that I could come and see him in Chicago; that he would be back there in a few days, and if I did not come in, there would be no harm done, and if I did, the settlement could be made, and in the meantime the service would begin; it was to stop that night, I believe, the night of the 7th or the morning of the 8th in the United Press, and we could go ahead with the service." After this conversation Mr. Hoyt and Mr. Lawson went into the room

of the board of directors of the Associated Press, where a contract between appellant and the Associated Press was drawn up and executed, which bears date April 7, 1897, and, so far as material, and omitting the formal commencement, conclusion and signatures thereto, is as follows:

"*First.* The party of the first part hereby sells and conveys to the party of the second part the right and privilege of publishing in the Milwaukee Daily News, a newspaper printed in the English language at Milwaukee, Wisconsin, the day news report of The Associated Press for the term of ninety years, and to deliver to said party of the second part in time for publication in said newspaper the said report so far as it may be practicable so to do.

*Second.* Said party of the second part agrees to receive the said news report of said party of the first part for said term of ninety years and to publish the same in whole or in part in said newspaper continuously and to pay therefor ninety-two and fifty-five one-hundredths ($92.55) dollars per week in advance, and also to pay any additional weekly assessments made by the board of directors or executive committee of said first party upon said party of the second part, not exceeding fifty (50) per cent of the amount above agreed to be paid weekly, in like weekly installments in advance, and also to pay to said first party all fines which may be imposed on said second party under the by-laws and rules of said first party.

*Third.* Said party of the second part agrees to furnish to the party of the first part the news, local and telegraphic, of the following described territory, viz: The City of Milwaukee, Wisconsin, in accordance with the provisions and requirements of Section 1 of Article 11 of the by-laws of said party of the first part.

*Fourth.* It is mutually understood and agreed that the board of directors of said party of the first part shall have the right and power to change from time to time the weekly assessments to be paid by said party of the second part for the news report hereinbefore mentioned, without limit as to amount; and that said party of the second part shall pay the amount of said weekly assessment so long as it takes said news report.

In the event that said weekly assessment shall be increased more than fifty (50) per cent above the weekly amount specified and agreed to be paid by said second party at the date of this contract, then and in such case

said second party shall have the right to terminate this contract and all liabilities thereunder."

At the same time there was drawn up and executed an assignment of said guaranties of the United Press and the four New York papers, which, omitting the formal conclusion and signature, and also the part printed in italics below, is as follows:

"For value received, The News Publishing Company of Milwaukee, Wisconsin, and the Germania Publishing Company of Milwaukee, Wisconsin, hereby assign to the Associated Press, a corporation of the State of Illinois, all and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, damages, claims and demands whatsoever, by said News Publishing Company and the Germania Publishing Company, either or both now have, or hereafter can, shall, or may have, jointly or severally, for, upon, or by reason of the agreement and guaranty of the United Press with said News Publishing Company of Milwaukee, Wisconsin, dated April 2nd, 1894; *or upon or by reason of the guaranty of the New York Herald, the New York Tribune, the New York Sun, and the New York Times Publishing Company, of the performance of said agreement by the said United Press.*"

The news service to appellant began that night and continued until September 29, 1900. When the contract and assignment of the guaranties were executed they were retained by Mr. Lawson and by him brought to Chicago, and on April 12, 1897, appellant paid to the Associated Press the sum of $10,000, and received a receipt for the same executed in the name of the Associated Press by Victor F. Lawson, president, which is, omitting the date and signature, as follows:

"Received of the News Publishing Company, Milwaukee, Wisconsin, $10,000, the same being its payment for membership in the Associated Press for the use of the day report for the Milwaukee Daily News."

At the same time, on the request of Mr. Lawson, a new assignment of said guaranties was executed in the name of appellant by M. A. Hoyt, president, which, in addition to the assignment as above stated, contains the words therein

printed in italics. This new and additional assignment was prepared by the attorney in New York of the Associated Press to take the place of the original assignment prepared and executed in New York on April 7, 1897. The said guaranties were not, however, surrendered by appellant to the Associated Press until the $10,000 was paid on April 12, 1897, in Chicago. Under the by-laws of the Associated Press the appellant could not become one of its members without the consent of its other members in the city of Milwaukee, and there were four such members. Mr. Hoyt, as did also Mr. Lawson, endeavored to procure this consent, but both failed to get it, though the former offered to pay as high as $2,500 for such consent, and in consequence thereof, and because appellant had no other means of getting telegraphic news service than from the Associated Press, which service was absolutely essential to it in the publication of its paper, Mr. Hoyt, on behalf of appellant, entered into said contract with the Associated Press, made said assignments of said guaranties and delivered the same up to Mr. Lawson for the Associated Press. He protested against the said conditions required of him, but was compelled finally to yield and submit to them for the reason that appellant could not publish its paper without said news service, the expense of which, to get in any other way, he testifies "would have been so great that it would be prohibitive." In a communication dated April 6, 1897, to the " Milwaukee Local Board," which represented the then members of the Associated Press at Milwaukee, Mr. Lawson, referring to the application of appellant and another newspaper published at Milwaukee to become members of the Associated Press, said : " This is the only case in the entire country where money payments have been required by our members for the admission of United Press papers at this time." The Associated Press was compelled to and did pay to its other members at Milwaukee, before they would give their consent to the appellant and the Germania Publishing Company becoming members, the sum of $6,000 in addition to the $10,000 paid by appellant and $10,000

paid by the Germania Company. No part of the money paid by appellant was used by the Associated Press, except in its payment to its other Milwaukee members as above. Appellant knew that the money it paid—was so informed at the time—was to be divided among the Milwaukee papers. The Associated Press, through Mr. Lawson, in addition to the said payment of $10,000 by appellant, also insisted, as a condition of appellant's becoming one of its members, that appellant should surrender and assign its said guaranties to the Associated Press because, he stated, he had agreed with the four New York papers they should be protected on these contracts before appellant should be admitted as a member of the Associated Press. From the making of said contract to September 29, 1900, when the Associated Press ceased to do business, appellant paid it for said news service $15,973.16 (Mr. Hoyt testifies), not less in any week than the sum stipulated in the contract, $92.55. After September, 1900, the Associated Press, a New York corporation, continued the same news service prior to that time furnished by the appellee, the Associated Press, the Illinois corporation, to appellant, under the same contract up to the commencement of this suit in March, 1902.

Appellant, at no time prior to the commencement of this suit, repudiated said contract or demanded back said guaranties, and as we understand its counsel, it has never repudiated the contract, but brings this action to recover damages because it was compelled, by duress, to pay the sum of $10,000 and to surrender and assign said guaranties. At the time appellant paid said money and surrendered and assigned said guaranties, appellant's representative, Mr. Hoyt, believed that the action of the Associated Press and all its said requirements, as conditions to appellant's becoming one of its members, were lawful, and appellant in no way questioned their legality, though he protested against them and insisted they were unfair, and says that he only submitted to comply with said conditions because appellant's necessities, as above stated, forced him to do so. There is no evidence which in any way connects the ap-

pellee Noyes with any of the alleged wrongs to appellant, except that he is a director of the appellee, the Associated Press. He did not take any part whatever in any of the dealings or transactions between appellant and the Associated Press, except that after the contract was made he attended a meeting of the board of directors and voted in favor of submitting the claims of the Milwaukee papers, as to appellant's becoming a member of the Associated Press, to arbitration.

Under the facts as above detailed, and others appearing in the record, which more in detail supplement those stated, we think the evidence tends to show that the business of the appellee, the Associated Press, was on and prior to April 7, 1897, of such a nature, and its obligations to the public were such as to impress it with a public interest and therefore to require it to render the news service which it contracted to render appellant upon the same terms and conditions that it rendered like service to other newspaper publishers throughout the country, and without any discrimination whatever against appellant. It follows that the Associated Press had no legal right to require appellant to make the payment it did and to surrender and assign said guaranties as conditions to its becoming a member of the Associated Press and being furnished with the news service such as was given other newspapers, such requirements being in excess of the usual and regular charges made to such newspapers. In this regard we are of opinion that the decision in Inter Ocean Publishing Co. v. Associated Press, 184 Ill. 438-49, is controlling. The appellee in that case is the same as the appellee, the Associated Press, here. The principal question presented is similar to the one in this case. The court say : " It (The Associated Press) has devoted its property to a public use, and has, in effect, granted to the public such an interest in its use that it must submit to be controlled by the public for the common good, to the extent of the interest it has thus created in the public in its private property. The sole purpose for which news was gathered was that the same should be

sold, and all newspaper publishers desiring to purchase such news for publication are entitled to purchase the same without discrimination against them." The court further say, quoting from a previous decision, viz : " If the interest is public, then it is necessarily to all alike, common to all, and upon equal terms." The court further say : " The appellee corporation being engaged in a business upon which a public interest is engrafted, upon principles of justice, it can make no distinction with respect to persons who wish to purchase information and news, for purposes of publication, which it was created to furnish."

It seems to us clear that under the authority of this case and the celebrated case of Munn v. Illinois, 94 U. S. 113, an actionable wrong against appellant by the appellees, the Associated Press and Mr. Lawson, its president, is shown by the evidence presented to the trial court, and the case should have been submitted to the jury, so far at least as concerns these two appellees. There is no sufficient evidence, in our opinion, connecting the appellee Noyes with any of the matters charged in the declaration, except that he was a director of the Associated Press at the time in question, and subsequently indirectly approved of what had been done by the Associated Press; but we are not required to determine whether or not he is liable on that account.

The learned counsel of appellees, in an extended argument, make eight different contentions, the last being divided into five sub-heads, in which they claim that the action of the trial judge is justifiable. We will not refer to each separately, but in what we shall say we think may be found answers to all of their different points. It is said in effect that the transaction between appellant and appellees, at the time it took place, was not a tort, for the reasons that they all then believed that what was done was entirely legal, the Inter Ocean case, the first decision of the law bearing upon it, not having been decided until long after; and that the evidence fails to show that the business of the Associated Press was so affected as to be charged at that time with a public interest. The fact that the Inter

Ocean case was not decided until long after April, 1897, is wholly immaterial so far as concerns the legality of the transaction in question, and appellant's right of action based thereon.   The appellees, as well as appellant, were bound to know the law, and the legality of what they then did in no way depends upon the fact that the law, as announced in the Inter Ocean case, had not then been declared.   The facts with reference to the transaction, so far as concern the nature and extent of the business of the Associated Press, do not materially differ from what they were in the Inter Ocean case.   While the Inter Ocean case was decided in 1900, the matters which were the basis of the decision took place in December, 1897, and January, 1898, about nine months prior to the making of the contract here in question.   In Norton v. Shelby County, 118 U. S. 425–42, in which the validity of certain bonds issued by the Board of Commissioners of Shelby County, Tennessee, was in question, because a certain act of the legislature of that state was unconstitutional and had been so held by the courts subsequent to the issuance of the bonds, the court said:   " An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed."   To a like effect are the following authorities:   Marshall County v. Cook, 38 Ill. 44–52; Russell v. Rumsey, 35 Ill. 362–71; Chicago, W. & V. Coal Co. et al. v. People, etc., *ante*, p. 75.

It is also said that this is a New York contract, having been made there, and to be performed in Milwaukee, Wisconsin, and is not governed by the law of Illinois.   We agree with counsel that the contract is a New York contract, under the evidence in this record, and was to be performed in Milwaukee, but under the evidence we also think that while the contract should be construed according to the law of New York, that law not having been shown by any evidence in the case, it must be presumed that the law of New York is the same as in Illinois.   Morris v. Wibaux, 159 Ill. 627–51; Hakes v. Bank, 164 Ill. 273, and cases cited;

Juilliard v. May, 130 Ill. 87–97; Schlee v. Guckenheimer, 179 Ill. 593–6; Fortier v. Penn. Co., 18 Ill. App. 263. It then being presumed that the law of New York is the same as in Illinois, and the contract being in violation of the law of Illinois, as declared in the Inter Ocean case, *supra*, the appellees claiming as their defense that the contract did not violate the law of New York, it was incumbent upon them to plead and prove it. Mason v. Dousay, 35 Ill. 424–33; Miller v. Wilson, 146 Ill. 523–31; Dearlove v. Edwards, 166 Ill. 619–21. If it be said that because the contract was to be performed in Wisconsin, it is to be construed under the law of that state, and is valid there, the same situation is presented as to the contention that the New York law governs, because there is no plea nor proof as to the Wisconsin law.

A further claim is made to the effect that appellant having paid its money and delivered its property, the guaranties in question, voluntarily and upon its own request, there could be no right of action. We think this claim is untenable, for the reason that the basis of the action is the duress under which the appellant acted, in view of which there can be said to be no voluntary payment of the money nor voluntary parting with appellant's property. We think the case of Wabash Ry. Co. v. House, 101 Ill. App. 397, relied upon in this regard, is not in point.

In C. & A. R. R. Co. v. Chicago, etc., Coal Co., 79 Ill. 121–30, in which the railroad company exacted more freight from the coal company than was entitled to be charged under the terms of a contract between it, and the coal company was compelled to pay, because it had no other way to take its coal to market than over the tracks of the railroad company, it was held that the coal company might recover such excess of freight, and that the payment was not voluntary. The court say: "It can hardly be said these enhanced charges were voluntarily paid by appellees. It was a case of 'life or death' with them, as they had no other means of conveying their coal to the markets offered by the Illinois Central, and was

bound to accede to any terms appellants might impose. They were under a sort of moral duress, by submitting to which appellants have received money from them which in equity and good conscience they ought not to retain." (Citing cases.) To a like effect are : L., E. & St. L. R. R. Co. v. Wilson, 132 Ind. 517–21, and cases cited; Ohio C. Co. v. Whitcomb, 123 Fed. Rep. 359–62; West Vir. T. Co. v. Sweetzer, 25 W. Va. 434, and cases cited; Chicago v. Brewing Co., 97 Ill. App. 583; Yates v. Royal Ins. Co., 200 Ill. 202–13.

In the Wilson case, which was a suit to recover an overcharge of freight paid to a railroad company, the Supreme Court of Indiana, in a thoroughly considered case, reviewing many authorities, among others the coal company case in 79 Ill. 121, *supra*, gave its opinion that "the decided weight of authority is that the payment of an overcharge of freight to a railroad company engaged as a common carrier of goods is not a voluntary payment, within the ordinary meaning of that term."

In the Sweetzer case, *supra*, which was also a suit to recover for overcharges for freights made by a railroad company, the Supreme Court of West Virginia made a very full review of many cases, including the coal company case above mentioned, and say of it and an Alabama case referred to in the same line, that "they have not laid down the law any too strongly; and that neither objection nor protest by the shipper, when illegal freight charges are demanded by a railroad company, ought to be required, in order to entitle the shipper to recover, nor should the fact that the freight had been delivered when the payment was made, necessarily prevent such recovery."

In the Whitcomb case, *supra*, the United States Circuit Court of Appeals of the Seventh Circuit, in considering a like question, said: " Common carriers, bound by the law to serve all without discrimination, may not hold shippers to agreements exacted under the alternative of destruction of their business. The carriers having no right, other than that of physical might, to exact such an agreement, the

agreement itself partakes of the character of an agreement made under duress," and held that an extra charge of $2 per car made to one shipper, which was in addition to the published schedule of freight rates made by the defendant, and above what was charged to any other shipper, was discriminative and might be recovered back.

In view of the principle of the decision in the Inter Ocean case, we are of opinion that the rulings of the different cases from which we have quoted are applicable to the case at bar. The payment by appellant and the surrender of the said guaranties, as we think the evidence tends to show, being under duress, because of the necessities of its business, and not voluntary, there may be a recovery, for the reason that the Associated Press was under the same obligation to furnish to appellant news reports without discrimination, as the railroad companies in the cases referred to were bound to carry freight without extorting illegal and oppressive rates from the shipper.

It is also said that if there was duress appellant has waived it, because the Associated Press, the appellee, went out of business in the fall of 1900, when the duress, if any, ceased, though appellant did not promptly repudiate the contract and commence its action. The cases of Eberstein v. Willets, 134 Ill. 101, and Bogue v. Franks, 199 Ill. 411-19, are cited as supporting the contention. We think they have no application here, since this action is not based upon a rescission of the contract, (Brumbach v. Flower, 20 Ill. App. 219,) but upon the wrong done appellant at the time it was compelled to enter into the contract by reason of its necessities. Appellant was entitled to bring its action, as as in the case of any other tort, at any time before the Statute of Limitations was a bar.

The same line of argument is also made by appellees' counsel under their point that the contract was good until repudiated by the appellant, and Pullman Car Co. v. Central Transportation Co., 171 U. S. 138, and like cases are relied upon in support of the claim. We think these cases have no application, for the reason that no question of duress to bring about the contract was in the cases, and

they only go to the extent, which is well recognized law, that an illegal contract in so far as it is executed may be held good, it not being *malum in se* or *malum prohibitum.* Pearce v. Pearce, 184 Ill. 293; C., C., C. & St. L. Ry. Co. v. Wood, 189 Ill. 355. And even in cases of contracts *malum in se*, an action may be maintained where the parties are not *in pari delicto.* Such is this case. Baehr v. Wolf, 59 Ill. 470–4; Evans v. Funk, 151 Ill. 650–8.

It is also said that there is no evidence of the value of the guaranties, and therefore there could be no recovery on that branch of appellant's claim; also that there could be no recovery because the signatures to the guaranties were not sufficiently proved and there is no evidence that the owners of the New York newspapers ever authorized their execution. The document was received in evidence over the objection of appellees, and no cross-errors have been assigned by appellees. They cannot, therefore, question the action of the court in receiving it in evidence. It may be that upon another trial any alleged defect in the proof with regard to the guaranties may be supplied.

What has been said we think fully disposes of all the other points and arguments advanced by appellees' counsel, inasmuch as they all appear to be based upon the contention that the action of appellant was voluntary or that it should have repudiated the contract.

From a consideration of the whole record we are of opinion that the evidence presents a case for the consideration of a jury upon the questions of the nature and extent of the business of the appellee, the Associated Press, whether appellant's duress caused it to make said contracts, and the damages, if any, suffered by appellant.

For the error in not submitting the case to the jury, the judgment is reversed and the cause remanded.

*Reversed and remanded.*