## The News Publishing Company, Defendant in Error, v. The Associated Press, Plaintiff in Error.

### Gen. No. 19,778.

1. NEWSPAPERS, § 6*—*right to impose, discriminatory terms for news service.* Under the Illinois law, in compelling a newspaper company to accept excessive and unjust terms as a condition of obtaining news service is an actionable wrong.

2. APPEAL AND ERROR, § 1844*—*conclusiveness of decision on former appeal.* As to questions decided upon a former record as to a like statement of facts, the law declared in a former opinion of this court will be taken as the law in a review.

3. CONFLICT OF LAWS, § 12*—*law governing legality of news service contracts.* The wrong committed by a press association in requiring illegal exactions in a contract for news service becomes consummated at the time of the contract rather than at the time of the subsequent acts of payment or parting with property, so that the right of action, if any, is governed by the law of the place where the contract was made.

4. NEWSPAPERS, § 6*—*admissibility of evidence.* In an action to recover damages for an alleged illegal discrimination and exaction growing out of the by-laws of a press association, where the contract

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

was made without the State and not to be performed within the State, the exclusion of decisions of the *lex loci* is erroneous if the law therein stated was applicable and different from that of the forum.

5. CONFLICT OF LAWS, § 12*—*law governing legality of a news service contract.* If a press association may in New York lawfully impose conditions in its news service contracts which in other jurisdictions are declared illegal and as unjustly discriminating, the mere act of entering into the contract or negotiating for such conditions, whether they be called requirements or exactions, cannot be deemed illegal or tortious in New York, as the alleged tort, if any, is founded upon a contract, valid where made, and there can be no cause of action in a State where it is neither made or to be performed.

6. NEWSPAPERS, § 6*—*scope of law against discriminatory exactions in giving news service.* The law which prohibits those engaged in a business affected by a public interest from unjustly discriminating among those receiving news service is not a statutory enactment but a rule of the common law, and it is not local to the State or limited in its application to corporations, and cannot reasonably be invoked against a corporation where it would not be against others engaged in a business clothed with a public interest, unless there is something in its charter or the law under which it is incorporated that requires observance of such a distinction.

7. CONFLICT OF LAWS, § 1*—*extent of application of doctrine of comity.* While this State will not enforce by comity a contract made in a foreign State, or give effect to its laws, so as to defeat the public policy of this State, the rule is not applicable where a party to a contract made in a foreign State, not to be performed in this State, comes into the State not to enforce it but to effect a repudiation of it, as in such case he will be relegated to the laws where the contract was made or to be performed.

GRIDLEY, J., dissenting.

Error to the Circuit Court of Cook county; the Hon. CHARLES H. BOWLES, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1913. Reversed. Opinion filed December 22, 1914.

WILSON, MOORE & MCILVAINE, for plaintiff in error; N. G. MOORE, of counsel.

JOSEPH L. MCNAB and TAPPAN GREGORY, for defendant in error; S. S. GREGORY, of counsel.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

MR. PRESIDING JUSTICE BARNES delivered the opinion of the court.

This writ of error seeks to reverse a judgment entered against the Associated Press (referred to as defendant) for $23,025.40, in an action on the case brought by the News Publishing Company (referred to as plaintiff), publisher of the Milwaukee Daily News, against said Associated Press, Victor F. Lawson, its president, and two of its directors, to recover damages for alleged unlawful exaction, based on the following state of facts:

On March 26, 1894, the News Publishing Company became a member of the United Press, a rival news agency of the Associated Press, and entered into a contract therewith for news service, which the latter° guarantied to furnish for the period of five years, and appended to the contract, virtually as a part thereof, was a written guaranty of performance of the obligations of the United Press under said agreement, purporting to be signed for certain New York papers or their publishers, towit: The Herald, The Tribune, The Sun and the New York Times Publishing Company. On March 31, 1907, the United Press notified the plaintiff and its other members that its services would be discontinued after April 7th. Under the necessity of obtaining adequate news service from the latter date, the News Publishing Company, through its president, Melvin A. Hoyt, entered into negotiations with Lawson, as president of the Associated Press, in New York City, resulting in the following application:

"To THE BOARD OF DIRECTORS,
        Associated Press, New York.

GENTLEMEN:

I hereby make application for a "B" membership in the Associated Press on the following terms in behalf of the Daily News of Milwaukee, Wisconsin. A payment to the Associate(d) Press of Ten Thousand Dollars in cash or Five Thousand Dollars in cash and

a note for Five Thousand Dollars running one year at 6% interest, secured by my contract at my option, which I will exercise within thirty days from date.

Yours respectfully,

M. A. HOYT,

President, News Publishing Company.''

New York, April 6, 1897.''

On April 7th said board of directors passed a resolution granting the application and directing that the name of plaintiff be placed on its membership roll with the proviso that the $10,000 be held in trust for distribution among its other members in Milwaukee. Under one of defendant's by-laws plaintiff could not become a member without their consent, which, it was understood, the Associated Press would obtain, using said sum for that purpose. On the day the resolution was passed, the contract for service (on a basis of specified rates and tolls not complained of) was signed and went into effect, and plaintiff received defendant's news service from that date. It was also required and agreed upon as a part of the transaction that plaintiff was to assign and surrender the ''guaranties'' aforesaid.

Acting upon the option provided for in said application, Hoyt, as president of the News Publishing Company, paid the $10,000 in cash to Lawson in Chicago on April 12th, the latter giving a receipt to plaintiff for ''its payment for membership in the Associated Press for the use of the day report of the Milwaukee Daily News,'' and at the same time delivering to Hoyt plaintiff's copy of the written contract for service, which, as we construe the application, was to be held merely as security for the note in case plaintiff elected to give one in accordance with its provisions. When said contract for service was signed, the News Publishing Company, by another written instrument, assigned to the Associated Press ''all manner of action and actions, cause and causes of action, suits, debts,'' etc., it might have by reason of its agreement with the United

Press.   When the $10,000 was paid to Lawson in Chicago, there was, at Lawson's request, executed and substituted for said assignment a new instrument, differing from the first only by adding "or upon or by reason of the guaranty of the New York Herald, New York Tribune, New York Sun, and the New York Times Publishing Company, of the performance of the said agreement by the said United Press."   At the same time the so-called "guaranties" were surrendered.   Both assignments were executed in the name of plaintiff by its president, Hoyt, the first in New York, the latter in Chicago.   Both in New York and Chicago at the times of the respective transactions therein Hoyt protested against these requirements as conditions of plaintiff's obtaining defendant's service.

These are the main facts on which, from the point of view we take, our conclusion must rest.   A more replete statement thereof is unnecessary, but will be found in *News Pub. Co. v. Associated Press,* 114 Ill. App. 241, where the judgment had in the first trial of the action was reversed because the court directed a verdict for the defendants instead of submitting the case to the jury.   The record now before us is that of the second trial.

The gravamen of the action is an illegal exaction of an excessive and unlawful price as a condition for defendant's services.   The primary and, as we view it, decisive question is whether there was a cause of action in the State of Illinois.   To decide it requires us to determine what were the particular acts constituting the tort charged and where they took place.   As summarized in one part of the declaration, the actionable wrong is that defendant "required the said plaintiff, as a condition of such membership and of the obtaining of the said news service, not only to pay said sum of $10,-000, but to surrender or assign to the said defendant, the Associated Press, all its right under the said contracts with the United Press upon or by reason of the guaranties" aforesaid.

In the former decision above referred to, this court held on like evidence in most respects that there was an actionable wrong (p. 252); but the conclusion was reached upon application of the Illinois law. We there said that the basis of the action was "the wrong done appellant [News Publishing Company] at the time it was compelled to enter into the contract by reason of its necessities" (p. 256); and that the contract was a New York contract to be performed in Milwaukee, and should be construed according to the law of New York (p. 253), but in the absence of proof thereof presumed it to be the same as in Illinois. But in the record before us there was proof presented on that subject. Of course, as to the questions decided upon the former record as to a like state of facts, the law declared in the former opinion of this court must be taken as the law in this review. *Novak v. Rochester German Ins. Co.*, 156 Ill. App. 352.

Plaintiff contends, however, that whatever the prior contract, and notwithstanding it had already gone into effect, not until the money was paid and guaranties surrendered in Chicago was the wrong actually consummated and the cause of action perfect, and that, therefore, the law of Illinois controls the right of recovery. While plaintiff may not have suffered any actual damages until that time, yet the cause of action, if any, related back to the act from which they ensued, —the taking advantage of its necessities and compelling it to accept excessive and unjust terms as a condition of obtaining service. It was not the receipt of the unlawful price but the act of requiring and compelling it that was the essence of the wrong charged. In other words, the alleged wrong grew out of the contract, and not the act of payment or parting with property. This is in consonance with our former holding that the action was based upon the wrong done plaintiff "at the time it was compelled to enter into the contract by reason of its necessities." In this connection we held that payment made under compulsion, though made

subsequent thereto, could not be deemed voluntary so as to defeat a right of recovery, citing from *West Virginia Transp. Co. v. Sweetzer*, 25 W. Va. 434, where, in a suit brought to recover excessive freight charges, the Court said: "Nor should the fact that the freight had been delivered when the payment was made prevent such recovery." In a similar case (*Conn v. Louisville & N. R. Co.*, 21 Ky. Law Rep. 469) it was held on the question of determining where the action growing out of a contract of shipment should be brought that the place where the contract was made or to be performed, and not the place of paying the freight, was the controlling factor. If, therefore, we had not already so decided on the former appeal, we would nevertheless reach the conclusion that the alleged wrong to plaintiff was done in the State of New York; and whether the acts or transactions constituting it were tortious must be tested and controlled by the law of that State. *Christiansen v. William Graver Tank Works*, 223 Ill. 142, 150; *Mexican Cent. Ry. Co. v. Gehr*, 66 Ill. App. 173, 192.

It is also in consonance with our former opinion to hold that the acts or thing constituting the alleged illegal exaction cannot be considered as separate and apart from the contract entered into. It was one transaction whereby plaintiff contracted for and obtained news service from defendant, the consideration of which was the regular tolls or rates, and in addition thereto said sum of money and surrender of said guaranties. This, in fact, is the theory of the declaration. Whether these additional requirements, referred to as illegal exactions, were unlawful depends, therefore, upon said contract, which must, as said in the former appeal, be construed by the law of New York.

The illegality of said requirements is said to consist in this, that defendant was a *quasi* public corporation and as such bound not to exercise unjust discrimination in furnishing its news service. In this connection

it should be borne in mind that the discrimination here charged grew out of the by-law aforesaid under which the alleged illegal exaction was made.

Bearing upon the question of the validity of said by-law and of the contract, defendant, upon the second trial, now under review, offered in evidence, as the law of New York governing the transactions in question, the decision in *Matthews v. Associated Press of New York,* reported in 136 N. Y. 333. The decision was excluded by the court and not construed and applied as requested, and error is assigned upon such action. This was error if the law therein stated was applicable and different from that in our own State.

In holding that there was actionable wrong, this court, in its former decision, applying to the transactions the law of this State, deemed the decision in *Inter Ocean Pub. Co. v. Associated Press,* 184 Ill. 438-449, as controlling (p. 251). In that case the Inter Ocean Publishing Company filed its bill for an injunction against the Associated Press to restrain it from suspending or expelling it from membership and from refusing to furnish it news under its contract, and from doing any act or thing to deprive it of the news gathered from other news agencies contrary to a certain by-law of the association which prohibited its members from purchasing news reports from other agencies. Such by-law was held to be null and void and beyond the power of the corporation to enact. In the New York case substantially the same questions were presented to the court. In that case also the plaintiffs were publishers of newspapers and members of the defendant Association, and sought the same relief upon an almost identical state of facts, involving the validity of a like by-law of the association prohibiting its members from receiving or publishing the news dispatches of any other association covering a like territory, etc. The question before the court was whether said by-law was legal and enforceable, the contention

being that the association had not the power to enact it. The power and by-law were upheld.

As to the state of facts and remedy sought, and also as to the character of the corporation sought to be enjoined, its objects and the nature of its business, the cases were alike and, therefore, presented for consideration and application the same questions of law. In the *Inter Ocean* case *supra,* the provisions of the by-law were held invalid as tending to create a monopoly in favor of the association and to prevent its members from procuring news from others engaged in the same character of work. It was there held that the business of the association was so impressed with a public interest that it could make no unjust discrimination among its members in its service. But the New York court deemed similar provisions a reasonable restraint upon the members of the association, consistent with its object and the business it was specially organized and incorporated to transact, and while it held that the by-law did not tend to establish a monopoly, and was not otherwise repugnant to the law of New York, it did not specifically discuss whether or not such association was a *quasi* public corporation, or whether, if so, such by-law operated to discriminate unjustly among its members; but, if it was an institution of that character, the court, under the law of that State, could take judicial notice thereof. *Eaton, Cole & Burnham Co. v. Avery,* 83 N. Y. 31-34. At any rate, if such question was involved in the *Inter Ocean* case, *supra,* it would seem that upon a like proceeding and state of facts it was also involved in the *Matthews* case, *supra.* We cannot properly assume that in reaching its decision the New York court did not take into consideration the nature of the business of the Associated Press, or that it would not have reached the same conclusion had the question of public interest been specially pressed upon its attention. We can only infer that in passing on the validity of the by-law it con-

sidered the nature of the business and character of the corporation before it, whose corporate objects and business were expressly alluded to in its decision. ` If, therefore, such an association may in New York lawfully impose conditions in its service contracts, which are elsewhere classified as unjustly discriminating, then the mere act of entering into the contract or negotiating for such conditions, whether they be called requirements or exactions, cannot be deemed illegal or tortious in New York. The alleged tort is, in fact, founded on the contract. If the latter was legal, as it would seem to be in New York, where made, then there was no tort there, and no cause of action here.

The contention made here that the by-law in question was unjustly discriminating in its effect, was also made against the by-law in the *Inter Ocean* case. But if the by-law in the *Inter Ocean* case was nevertheless enforceable in New York, then by parity of reasoning the by-law here involved, being of the same character, would be enforceable there. We recognize, however, that the case at bar cannot be said to rest entirely upon the question whether the by-law in question was enforceable. While the requirement of $10,000 was in pursuance thereof, that can hardly be said of the assignment or surrender of the guaranties. However, if on principle the association might lawfully require said sum as consideration for membership and entering into a contract for service, we see no reason why it might not also require such assignments.

It is also contended by plaintiff that the contract was not completed until the transactions took place in Chicago, namely, the payment of $10,000, the assignment and delivery of the guaranties and the delivery of plaintiff's copy of the contract. In holding that the alleged tort took place in New York, we have practically considered and disposed of this contention. Neither the application for membership nor the agreement or consent to assign and surrender the guaran-

ties are to be viewed in the light of a separate agreement, but, as before stated, each is a part of one transaction. The payment of the one and the performance of the other were, as before stated, in reality but conditions of the contract of service and part of the consideration therefor. The only object of membership was to get the contract. After it went into effect, plaintiff paid part of the consideration agreed upon through such transactions. The application, in effect, provided for subsequent payment of the $10,000, by giving an option to be exercised in thirty days as to the mode of payment. If plaintiff elected to give a note as therein provided for, then the contract was to be held as security for its payment. Having elected to pay all cash, the contract, or its copy thereof, was delivered to it. The new assignment was practically a mere substitution, without material modification, of the one executed and delivered in New York, and we fail to see that plaintiff, after said assignment, parted with any additional right by surrendering the original contracts or guaranties. In any event, the things done in Chicago are important here only as performances in the nature of making a deferred payment of part of the consideration for the real thing contracted for, and which plaintiff had already begun to receive,—news service from defendant.

To sustain a different construction, plaintiff's counsel refer to certain conversations which Hoyt claims he had with Lawson during the negotiations for the contract of service. But it is plain that they could not be received to vary the terms of the written instruments into which they were merged.

But it is contended by plaintiff's counsel that whatever the law may be in New York governing the subject, yet defendant being a corporation whose business is clothed with a public interest and being incorporated in this State, it carried into New York the same limitations as in Illinois in respect to its obligations to deal

with all alike and without discrimination. In support of this contention it is argued "that the general laws of the State are in effect the charter of a corporation organized under them," and the charter being limited and modified thereby the corporation is subject to such limitations when it goes into another jurisdiction, and, therefore, cannot there enter into a contract that contravenes the general law or local policy of the State of its creation. But in *Warren v. First Nat. Bank of Columbus,* 149 Ill. 9, it was said (p. 25):

"The general laws and regulations of a State are intended to govern only within the limits of the State enacting them, and the State can have no power to give them extra-territorial force. Such provisions do not, as a rule, enter into contracts made within the State, if they are to be performed in another jurisdiction. It follows, therefore, that where a State statute is enacted for the enforcement of a local policy only, it will not be presumed that such statutory provision was intended by the State, or by the shareholders forming the corporation, to enter into the charter contract, and to regulate the company in its transactions outside of the State, and it will not affect the validity of the dealings of the company in foreign States."

We think this decision is conclusive of the question thus raised. We have carefully examined the authorities cited on this point by plaintiff but do not think they sustain its position or are at variance with the law as above stated. They go no further than to state the familiar proposition that where a corporation is formed under the general incorporation law, that law must be regarded as entering into and forming a part of its charter. But there is no express provision in the incorporation laws of this State or our statutes that imposes any special limitation upon corporations in relation to this matter, or that creates or indicates any local policy of this State in regard thereto. As said in *Raisor v. Chicago & A. Ry. Co.,* 215 Ill. 47: "In order to ascertain the policy of the State in respect to

any matter, the acts of the legislative department must be looked to. It is not within the province of the courts to create public policy. Their province is limited to declaring it when ascertained." See also *Dougherty v. American McKenna Process Co.*, 255 Ill. 369, and *Carroll v. City of East St. Louis*, 67 Ill. 568.

But the law which prohibits those engaged in a business affected with a public interest from unjustly discriminating among those receiving their service is not a statutory enactment but a rule of common law. It is not local to this State, nor limited in its application to corporations. It cannot reasonably be invoked against a corporation where it would not be against others engaged in a business clothed with a public interest, unless there is something in its charter or the law under which it is incorporated that requires observance of such a distinction.

To be sure, it is settled law of this State that it will not, by comity, enforce here contracts made in a foreign State, or give effect to its laws, so as to defeat the public policy of this State. But that question is not presented on this record. It might be if the Associated Press were seeking to enforce against plaintiff the terms of the contract that are said to contravene our laws. The situation here, however, is entirely different. It is one in which a party to a contract made in a foreign State, not to be performed here, comes into this State, not to enforce said contract but to effect a repudiation of it. In such a case he will be relegated to the laws of the State where the contract was made or was to be performed. As said in *Northern Pac. R. Co. v. Babcock*, 154 U. S. 190, quoting from a decision of the Minnesota State court:

"Every day our courts are enforcing rights under foreign contracts where the *lex loci contractus* and the *lex fori* are altogether different, and yet we construe these contracts and enforce rights under them according to their force and effect under the laws of the State where made. To justify a court in refus-

ing to enforce a right of action which accrued under the law of another State, because against the policy of our laws, it must appear that it is against good morals or natural justice, or that, for some other such reason, the enforcement of it would be prejudicial to the general interests of our own citizens."

. This contract was not one which could be said to be against good morals or natural justice or one which in anywise affected the status of the defendant corporation in this State, where it was created, or its relation to any citizen of this State, and no question is here raised, or properly can be on this record, that the execution of the contract in the State of New York was for the purpose of evading the law of this State.

We are compelled to hold, therefore, that tested by the New York law, which must control, there was no actionable wrong and, therefore, no cause of action here, and that the jury should have been instructed to render a verdict for defendant as requested. As, therefore, a reversal must necessarily follow, we refrain from discussing other questions raised on the record that might otherwise be deemed important.

*Reversed.*

MR. JUSTICE GRIDLEY dissenting. I am of the opinion that the judgment against the defendant, The Associated Press, should be affirmed.